2021 UT 59

IN THE

# SUPREME COURT OF THE STATE OF UTAH

KELLY LAWS,
*Appellant*,

*v.*

WILLIE GRAYEYES,
*Appellee*.

No. 20190088
Heard March 8, 2021
Filed September 30, 2021

On Direct Appeal

Seventh District Court, Monticello
The Honorable Don M. Torgerson
No. 180700016

Attorneys:

Peter Stirba, Valerie Wilde, Matthew Strout, Ciera Archuleta, Salt Lake City, for appellant

Steven C. Boos, Durango, CO, David Irvine, Eric P. Swenson, Alan L. Smith, Salt Lake City, for appellee

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which JUSTICE PETERSEN joined.

ASSOCIATE CHIEF JUSTICE LEE authored an opinion concurring in part and concurring in the judgment.

JUSTICE PEARCE authored an opinion concurring in part and concurring in the judgment, in which JUSTICE HIMONAS joined.

CHIEF JUSTICE DURRANT, opinion of the Court:

### Introduction

¶1 Willie Grayeyes declared in March 2018 that he would run for the office of San Juan County Commissioner. To prove to the county clerk that he was a county resident, and therefore eligible to

run for county office, Grayeyes provided coordinates and satellite images for his place of residence in San Juan County.

¶2    At this time, Kelly Laws, who was also running for county commissioner, had reason to believe that Grayeyes did not live at the coordinates he provided with his declaration of candidacy. But rather than raise his concerns then, Laws waited until after Grayeyes won the election.

¶3    Laws filed a challenge shortly after the election. The Seventh District Court concluded that Laws had waited too long to raise his concerns about Grayeyes's residency. But the court nevertheless addressed the merits, concluding that Grayeyes was a resident of San Juan County, and declined to overturn the results of the election.

¶4    On appeal, we conclude that Laws lacked standing to file suit in the first place because he has not alleged a sufficiently particularized injury. Accordingly, we dismiss Laws's claim for lack of jurisdiction. We also affirm the district court's rejection of Grayeyes's cross-appeal for attorney fees.

**Background**

¶5    Grayeyes declared in March 2018 that he would run as a candidate for the office of San Juan County Commissioner. He filed his declaration with the county clerk, affirming that he resided in San Juan County and providing coordinates and satellite images for a place of residence on Navajo Mountain.[1]

¶6    That same month, Wendy Black, who is not a party to this case, challenged Grayeyes's candidacy under Utah Code section 20A-9-202, claiming that he was not actually a San Juan County resident. The county clerk asked the Sheriff's Department to investigate the concerns raised in Black's candidacy challenge. Sheriff Turk went to Navajo Mountain and tried to locate Grayeyes's residence. He interviewed people there and discovered that someone else lived in the house at the coordinates Grayeyes had provided to the county clerk. The clerk consequently removed Grayeyes from the ballot.

¶7    Shortly thereafter, Grayeyes appealed the clerk's decision in federal district court. That court concluded the clerk had acted outside of his authority by initiating an investigation into Grayeyes's

---

[1] Grayeyes submitted coordinates and satellite images because houses on Navajo Mountain typically do not have address numbers.

residency rather than relying solely on the information included with Black's candidacy challenge as required by statute. So, in August 2018, the federal district court issued an injunction requiring San Juan County to place Grayeyes's name back on the ballot. But the federal district court ultimately did not resolve Black's concerns about Grayeyes's residency on the merits, instead dismissing her candidacy challenge for other reasons.[2]

¶8 Laws knew about Black's candidacy challenge by March 2018 but chose not to file his own challenge at that time. Instead, Laws relied on Black's challenge to resolve any concerns he had about Grayeyes's candidacy. In fact, Laws waited until after Grayeyes defeated him in the election to raise his concerns.

¶9 On November 6, 2018, Grayeyes won the election for county commissioner. Within forty days of the official canvass, as required by Utah Code section 20A-4-403, Laws filed a complaint challenging Grayeyes's eligibility to run for and serve in that office.

¶10 The Seventh District Judicial Court held a bench trial in January 2019. Grayeyes submitted a motion to dismiss Laws's complaint for lack of standing a few days before the trial, but the district court never ruled on the motion.[3] Both Laws and Grayeyes presented evidence and called witnesses to testify regarding Grayeyes's residency.

¶11 Laws submitted the report Sheriff Turk had prepared regarding his investigation of Grayeyes's residency on Navajo Mountain in response to Black's March 2018 challenge to Grayeyes's residency. The court admitted Sheriff Turk's testimony about what he saw, the notes and photographs he took at the time, and a videotape of an interview with Grayeyes. But the court excluded body cam footage of Sheriff Turk's interviews with people he met while on Navajo Mountain as inadmissible hearsay. These

---

[2] *Grayeyes v. Cox*, No. 4:18-cv-00041, 2018 WL 3830073, at *8 (D. Utah Aug. 9, 2018). Judge Nuffer's focus turned to Grayeyes's claims that the county clerk violated his due process rights and various other issues. *Id.* at *6–9.

[3] Although the district court did not address Grayeyes's argument that Laws lacked standing in its initial decision, the court did note that Laws had standing as a registered voter under Utah Code section 20A-4-403(1) in its order rejecting Grayeyes's request for attorney fees.

interviews corroborated Sheriff Turk's discovery that someone else lived in the house at the coordinates Grayeyes submitted with his declaration of candidacy.

¶12 Laws also presented evidence tying Grayeyes to Arizona. Laws established that Grayeyes had an Arizona driver's license, owned an uninhabitable mobile home in Page, Arizona, picked up his mail from an Arizona post office, often bought groceries in Arizona, and sometimes stayed with a girlfriend in Tuba City, Arizona.

¶13 To counter these facts, Grayeyes presented evidence regarding Navajo cultural practices tying him to San Juan County, including the practice of burying a child's umbilical cord at his spiritual home. Grayeyes's umbilical cord is buried on Paiute Mesa, he was raised there, and his family considers the area their place of origin. Grayeyes also demonstrated that he had spent much of his life representing Navajo Mountain in tribal politics and was employed by the Navajo Mountain Chapter of the Navajo Nation at the time of trial.

¶14 Grayeyes did not dispute the fact that he owns a mobile home in Page, Arizona and sometimes stays with his girlfriend in Tuba City, Arizona. But he presented evidence that he spends about sixty to eighty percent of his time on Navajo Mountain, staying in a shade hut, with his sister, or at his daughter's cabin.

¶15 Witness testimony showed that Grayeyes never made the mobile home in Arizona his general residence. He and his wife bought the mobile home so their children could attend public school in Arizona. Grayeyes's wife stayed with their children there until she passed away in 1987. During that time, however, Grayeyes remained at Navajo Mountain to run cattle and stay involved in tribal politics. Apart from staying at the mobile home for the duration of one school year, Grayeyes never lived there as a permanent resident.

¶16 Considering this evidence, the district court "ha[d] no problem concluding that Grayeyes maintain[ed] his principal place of residence in San Juan County." The court found that Grayeyes spends a majority of his time in San Juan County, has consistently lived there throughout his life, and has deep political and cultural connections to the area. The court further found that Laws never credibly refuted these facts at trial.

¶17 The court was not persuaded by the evidence tying Grayeyes to Arizona. It found that "all of the other Utah residents at Navajo Mountain/Paiute Mesa" buy groceries and access critical services in Arizona "as a matter of convenience."

¶18 The court also noted that in making this determination, it was rejecting Laws's contention at trial "that a particular house is required for a person to have a principal place of residence." In the court's view, "the 'single location where a person's habitation is fixed' could mean a larger geographical area and include various places," and so long as Grayeyes's shade hut, his sister's house, and his daughter's cabin fell within a single voting precinct, "that geographical area is sufficient to be a principal place of residence." The court therefore concluded that Grayeyes was a San Juan County resident and thus eligible to serve as county commissioner.

¶19 Following trial, Grayeyes filed an application for attorney fees, which the court rejected, concluding that Laws had filed his complaint in good faith. In the court's view, Laws had presented a legitimate dispute regarding Grayeyes's residency but ultimately lost on the merits. The court also rejected Grayeyes's assertion that he was entitled to attorney fees under the private attorney general doctrine. The court held that the private attorney general doctrine had been disavowed by the legislature, but that, regardless, general principles of equity and justice did not justify an award of fees in the case of "a straightforward election challenge authorized by statute."

¶20 Laws appealed the trial court's decision, claiming that the court erred in concluding that Grayeyes was a San Juan County resident. Grayeyes filed a cross appeal, arguing that Laws lacked standing to file his election challenge and that the court erred in declining to award him attorney fees.

## Standard of Review

¶21 Whether Laws has standing to file an election challenge is a mixed question of law and fact. For mixed questions, we uphold the trial court's findings of fact unless clearly erroneous, and we review the court's ultimate conclusion for correctness.[4]

¶22 "The standard of review on appeal of a trial court's award of attorney fees is patent error or clear abuse of discretion."[5] But because Grayeyes challenges the constitutionality of two statutes on

---

[4] *State v. Thurman*, 846 P. 2d 1256, 1269 (Utah 1993).

[5] *Valcarce v. Fitzgerald*, 961 P.2d 305, 316 (Utah 1998) (citation omitted) (internal quotation marks omitted).

which the district court relied to reach its decision, we review the court's interpretation of those statues for correctness.[6]

## Analysis

¶23 Both parties raise multiple issues on appeal. We first address Grayeyes's argument that Laws lacks standing to challenge his election because Laws has not met the traditional standing requirements. Laws argues that statutory standing should be enough on its own. We do not address this argument, however, because it is inadequately briefed. In the alternative, Laws argues he has met the requirements for traditional standing. We disagree. Laws has not alleged a sufficiently particularized injury. Because we conclude that Laws has not met the requirements for traditional standing, we do not address his remaining arguments.

¶24 We next consider Grayeyes's argument that the court erred in rejecting his application for attorney fees under general equitable principles and the private attorney general doctrine. We affirm the district court because we reject Grayeyes's argument that the district court erred in relying on Utah Code section 78B-5-825 in denying his petition for fees. This statute does not unconstitutionally limit courts' authority to award attorney fees in the way Grayeyes asserts. And Grayeyes, in defending himself in this case, has not satisfied the private attorney general doctrine. So we affirm the district court's decision.

## I.  Laws Lacks Standing

¶25 Grayeyes argues that Laws lacks standing to challenge his election to the office of county commissioner because Laws has not satisfied the traditional standing requirement of demonstrating a constitutionally cognizable injury. In response, Laws argues that he has statutory standing to sue under Utah Code section 20A-4-403(1)(a). But in the event statutory standing is not enough on its own, Laws also claims to have met the traditional requirements for standing.

¶26 We address Laws's arguments in reverse order. First we consider whether Laws has met the traditional requirements for standing and conclude that he has not. We then reject Laws's argument that statutory standing should be enough even absent

---

[6] *See Utah Dep't of Transp. v. Ivers*, 2009 UT 56, ¶ 9, 218 P.3d 583 ("[T]he interpretation of a statute . . . presents a question of law, which we review for correctness.").

traditional standing because Laws has not sufficiently briefed this issue.

### A. Laws Has Not Alleged a Particularized Injury for Traditional Standing

¶27 We have held that "[s]tanding is a jurisdictional requirement that must be satisfied before a court may entertain a controversy between two parties."[7] To assess whether a party has traditional standing, we employ a three-part test:

> First, the party must assert that it has been or will be adversely affected by the [challenged] actions. Second, it must allege a causal relationship between the injury to the party, the [challenged] actions, and the relief requested. And third, it must request relief that is substantially likely to redress the injury claimed.[8]

---

[7] *Jones v. Barlow*, 2007 UT 20, ¶ 12, 154 P.3d 808 (citation omitted) (internal quotation marks omitted).

[8] *S. Utah Wilderness All. v. San Juan Cnty. Comm'n*, 2021 UT 6, ¶ 14, 484 P.3d 1160 (alterations in original) (emphasis omitted) (citations omitted) (internal quotations marks omitted).

In his concurring opinion, Justice Pearce expresses concern that we applied the traditional standing test in *Southern Utah Wilderness Alliance v. San Juan County Commission* without grappling with its origins in Utah law. *See id.*; *infra* ¶ 98. But our reliance on the test in that case was consistent with established caselaw. *See, e.g.*, *Alpine Homes, Inc. v. City of W. Jordan*, 2017 UT 45, ¶ 34, 424 P.3d 95; *Brown v. Div. of Water Rts. of Dep't of Nat. Res.*, 2010 UT 14, ¶ 17, 228 P.3d 747; *Hogs R Us v. Town of Fairfield*, 2009 UT 21, ¶ 8, 207 P.3d 1221; *Utah Chapter of Sierra Club v. Utah Air Quality Bd.*, 2006 UT 74, ¶¶ 19–20, 148 P.3d 960.

Justice Pearce points out that these cases refer to two possible paths to standing, *infra* ¶ 100, "the traditional test and an alternative test," *Utah Chapter of Sierra Club*, 2006 UT 74, ¶ 18. While this "recognition of [an] alternative[] to traditional standing," *infra* ¶ 100, may support Justice Pearce's argument for revisiting the roots of our constitutional standing doctrine, the fact remains that in these cases we did, consistent with our established caselaw, rely upon our traditional standing test.

¶28 To be adversely affected under the first part of this test, we have held that a party must demonstrate a "particularized injury" "that gives him a personal stake in the outcome of the legal dispute."[9] A plaintiff generally falls short of this if he can assert "only a general interest he shares in common with members of the public at large."[10]

¶29 For example, in *Jenkins v. Swan*, we concluded that a plaintiff did not have standing to challenge the constitutionality of public educators serving as state legislators.[11] The plaintiff claimed to have standing because "educators serving as legislators . . . vote on legislation which financially benefits them as employees of the education system and . . . this adversely affects [him] as a taxpayer."[12] We rejected this argument because the plaintiff's "general status as a taxpayer and citizen d[id] nothing to distinguish him from any member of the public at large with regard to this dispute."[13] Laws lacks standing for the same reason.

¶30 Laws argues that, as a registered voter, he has a right to choose between eligible candidates and to participate in lawful elections. And "[h]aving a candidate that is ineligible to serve [as county commissioner] elected," Laws avers, "impairs and dilutes [his] constitutional right to participate in a regular and properly constituted election." But this injury is not particular to Laws—all registered voters in San Juan County share this same right to participate in lawful elections.

¶31 Laws's status as a registered voter, like the plaintiff's taxpayer status in *Jenkins v. Swan*, does not distinguish him from "any member of the public at large with regard to this dispute."[14]

---

[9] *Jenkins v. Swan*, 675 P.2d 1145, 1148, 1151 (Utah 1983) (emphasis omitted).

[10] *Id.* at 1149.

[11] *Id.* at 1151.

[12] *Id.*

[13] *Id.*

[14] *Id.* Because Laws alleges an impairment to his right to vote, we focus our analysis on other registered voters in the county. But we are not convinced that Laws's status as a registered voter gives Laws an interest in this case distinct even from those who are not registered to vote. Having a candidate elected that is ineligible or

(Continued)

Although Laws frames his alleged injury in terms of his personal right to vote, he does not claim to have suffered distinctly from other registered voters in the county as a result of Grayeyes's election. So we conclude that Laws lacks traditional standing.

### B. Laws's Statutory Standing Argument Is Inadequately Briefed

¶32 Laws argues that he has met the statutory requirements for standing to file suit under Utah Code section 20A-4-403(1)(a). And, in his view, meeting these requirements "should be sufficient for his claims to be properly adjudicated before this court." To support this argument, Laws cites our decision in *Washington County Water Conservancy District v. Morgan*, in which we considered whether a water district "ha[d] been granted special statutory standing . . . regardless of whether it satisfie[d] traditional standing requirements."[15] But beyond his discussion of this case, Laws does not adequately address the constitutional underpinnings of our standing caselaw. So we do not address Laws's argument that meeting the statutory requirements in section 20A-4-403(1)(a) is sufficient to grant standing on its own.

¶33 As discussed, "[s]tanding is a jurisdictional requirement that must be satisfied before a court may entertain a controversy between two parties."[16] We have held that this requirement stems from the Utah Constitution. "Although the Utah Constitution includes no . . . express limitation [on Utah courts' jurisdiction], we have held it nevertheless mandates certain standing requirements, which

---

unqualified is an injury that that could be suffered by all those residing in San Juan County, not just registered voters. Utah Code section 17-16-1 does not specify, and Laws does not argue, that its residency requirement for the office of county commissioner is solely for the benefit of registered voters. *See Carter v. Lehi City*, 2012 UT 2, ¶ 77, 269 P.3d 141 ("[A] decision whether to impose a residency requirement is based on broad policy considerations pertinent to the office . . . ."); *see also Gilbert v. State*, 526 P.2d 1131, 1135 (Alaska 1974) (stating that a durational residency requirement for state office "assur[es] that those who govern are acquainted with the conditions, problems, and needs of those who are governed"), *superseded by statute*, 2003 Alaska Sess. Laws, ch. 86, §§ 1–4.

[15] 2003 UT 58, ¶ 7, 82 P.3d 1125.

[16] *Jones*, 2007 UT 20, ¶ 12 (citation omitted) (internal quotation marks omitted).

emanate from the principle of separation of powers."[17] The Utah Constitution provides for a state government divided into the legislative, executive, and judicial departments. And it includes the restriction that "no person charged with the exercise of powers properly belonging to one of these departments, shall exercise any functions appertaining to either of the others . . . ."[18]

¶34 To ensure this separation, we require a plaintiff to demonstrate a personal stake in the outcome of a dispute. This requirement "limit[s] the jurisdiction of the courts to those disputes which are most efficiently and effectively resolved through the judicial process."[19] Absent such a requirement, "the courts might permit themselves to be drawn into disputes that are not fit for judicial resolution or amount to 'generalized grievances that are more appropriately directed to the legislative and executive branches of the state government.'"[20] So we do "not lightly dispense with the requirement that a litigant have a personal stake in the outcome of a specific dispute."[21]

¶35 Laws challenged Grayeyes's election as county commissioner under Utah Code section 20A-4-403(1), which states that "a registered voter" may "contest the right of any person declared elected to any office by filing a verified written complaint," including "one or more of the grounds for an election contest specified in Section 20A-4-402," "within 40 days after the canvass." Laws argues he has met these requirements in filing his suit, which he says "should be sufficient for his claims to be properly adjudicated before this court."

¶36 In support of this argument, Laws cites our decision in *Washington County Water Conservancy District v. Morgan*.[22] He argues that some of the language in our opinion indicates that traditional standing is only necessary in the absence of statutory standing. In

---

[17] *Brown*, 2010 UT 14, ¶ 12.

[18] UTAH CONST. art. V, § 1.

[19] *Jenkins*, 675 P.2d at 1149.

[20] *Soc'y of Pro. Journalists, Utah Chapter v. Bullock*, 743 P.2d 1166, 1170 (Utah 1987) (quoting *Jenkins*, 675 P.2d at 1149).

[21] *Terracor v. Utah Bd. of State Lands & Forestry*, 716 P.2d 796, 799 (Utah 1986).

[22] 2003 UT 58, 82 P.3d 1125.

*Morgan*, we stated that "[a] plaintiff who has not been granted standing to sue by statute must either show that he has or would suffer a distinct and palpable injury that gives rise to a personal stake in the outcome of the case."[23] Indeed, this language suggests that the court will consider the requirements for traditional standing only in the absence of statutory standing. This language was dicta, however, because we ultimately concluded that the water district lacked statutory standing.[24] So we did not reach the question of whether the legislature, by statute, could circumvent the traditional requirements for standing.

¶37 Because we have held that traditional standing is rooted in the Utah Constitution's principles of separation of powers, we decline to rely on dicta from *Morgan* to resolve the question of whether the Utah Legislature, in enacting section 20A-4-403, intended to grant standing to a plaintiff by statute when that plaintiff has not met the requirements for traditional standing. Beyond citing *Morgan*, Laws does not provide briefing on the constitutional issues implicated by his interpretation of section 20A-4-403.[25] So we reject this argument on inadequate briefing grounds and conclude that Laws lacks standing to challenge Grayeyes's election.[26] We therefore do not address the remainder of Laws's arguments on appeal. In addition, because Laws does not have standing, the district court lacked jurisdiction to decide this case on the merits.[27] So we vacate the district court's decision without assessing its correctness,

---

[23] *Id.* ¶ 17 (citation omitted) (internal quotation marks omitted).

[24] *Id.* ¶ 16.

[25] *See State v. Thomas*, 961 P.2d 299, 304 (Utah 1998) ("[A] reviewing court will not address arguments that are not adequately briefed."); *see* UTAH R. APP. P. 24(a)(8). ("The argument must explain, with reasoned analysis supported by citations to legal authority and the record, why the party should prevail on appeal.").

[26] Justice Pearce raises questions about our standing caselaw, concluding that "it is clear that there is work to be done" to ascertain the limits imposed by the Utah Constitution on the judicial department. *Infra* ¶ 112. But he concurs in our result, acknowledging that we are in "no position" to resolve this issue in this case. *Infra* ¶ 112. Because addressing the issues raised by Justice Pearce is unnecessary to resolve the case before us, we take no position on them.

[27] *See Jones*, 2007 UT 20, ¶ 12.

including its conclusion that Grayeyes is a resident of San Juan County under Utah Code section 20A-2-105(1)(a).

## II. Grayeyes Is Not Entitled to Attorney Fees

¶38   On cross appeal, Grayeyes contends the trial court erred in denying his application for attorney fees and court costs under general equitable principles and the private attorney general doctrine. Grayeyes advances two arguments, which we address in turn.

¶39   First, Grayeyes argues that the district court erred by relying on Utah Code section 78B-5-825 in denying his application for fees. According to Grayeyes, this statute imposes an unconstitutional limit on Utah courts' authority to grant fees according to general equitable principles. We disagree, however, because section 78B-5-825 does not limit courts' authority in the way Grayeyes describes.

¶40   Second, he argues that the Utah Legislature's disavowal of the private attorney general doctrine is unconstitutional. We decline to address this argument because, regardless of the vitality of the private attorney general doctrine, it would not apply here.[28]

### A. There Was No Bad Faith

¶41   On cross appeal, Grayeyes argues the court erred in relying on Utah Code section 78B-5-825 to deny his application for attorney fees. The court concluded that because Laws had not filed suit in bad faith, Grayeyes's claim did not fall within that statute's authorization for an award of fees. Grayeyes argues that this statute unconstitutionally limits Utah courts' authority to award attorney fees under general equitable principles. In Grayeyes's view, the district court should have also considered whether Laws had acted "vexatiously, wantonly, or for oppressive reasons." We disagree. Section 78B-5-825 does not limit a court's authority to award fees in the way Grayeyes describes.

¶42 Although we generally only award attorney fees to prevailing parties when authorized by statute or contract, "[t]he absence of such authority . . . does not bar the court from awarding attorney fees 'when it deems it appropriate in the interests of justice

---

[28] *See, e.g., State v. Wood*, 648 P.2d 71, 82 (Utah 1982) ("It is a fundamental rule that we should avoid addressing a constitutional issue unless required to do so.").

and equity.'"[29] Such fees may be justified in cases "in which the nonprevailing party acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons.'"[30] In his application for attorney fees, Grayeyes asked the district court to grant an award of fees under these general equitable principles.

¶43 Quoting Utah Code section 78B-5-825, the district court stated that "before awarding attorney fees for bad faith, [it] must find that the action was both . . . 'without merit and not brought or asserted in good faith.'" The court found that Laws had filed his complaint under section 20A-4-403 and presented appropriate grounds for challenging Grayeyes's eligibility to serve as county commissioner under subsections 20A-4-402(1)(b) and (g). The court also found that Laws had relied on a reasonable interpretation of the residency requirement found in section 20A-2-105 and presented credible evidence suggesting that Grayeyes did not reside on Navajo Mountain. Accordingly, the district court concluded that Laws had not filed suit in bad faith and therefore denied Grayeyes's application for attorney fees under general equitable principles.

¶44 On appeal, Grayeyes argues that the "or" in the list of factors commonly considered in awarding attorney fees in our case law required the district court to consider not only whether Laws filed suit in bad faith, but also whether he acted vexatiously, wantonly, or oppressively.[31] In Grayeyes's view, the district court's reliance on section 78B-5-825 was in error because the statute imposes an unconstitutional limitation on Utah courts' authority to award attorney fees according to principles of justice and equity. But section 78B-5-825 imposes no such limitation.

¶45 As the district court explained, section 78B-5-825 allows a court to award attorney fees where "the action or defense to the action was without merit and not brought or asserted in good faith." And in our case law we have defined "good faith" in this context as meaning "(1) [a]n honest belief in the propriety of the activities in question; (2) no intent to take unconscionable advantage of others;

---

[29] *Doctors' Co. v. Drezga*, 2009 UT 60, ¶ 32, 218 P.3d 598 (citation omitted).

[30] *Id.* (citation omitted).

[31] *See Stewart v. Utah Pub. Serv. Comm'n*, 885 P.2d 759, 782 (Utah 1994); *Shurtleff v. United Effort Plan Tr.*, 2012 UT 47, ¶ 23, 289 P. 3d 408; *Jensen v. Bowcut*, 892 P. 2d 1053, 1058 (Utah Ct. App. 1995).

and (3) no intent to, or knowledge of the fact that the activities in question will hinder, delay, or defraud others."[32] Grayeyes has not demonstrated that this broad definition leaves any of the factors he cites by the wayside.

¶46 "Vexatious" is defined as "intended to harass."[33] "Wanton" means "having no just foundation or provocation: malicious."[34] And "oppressive" means "unreasonably burdensome or severe."[35] These definitions closely parallel our interpretation of "good faith" as used in section 78B-5-825. So we reject Grayeyes's argument that this statute imposes an unconstitutional limitation on courts' authority to award fees.

¶47 In summary, we reject Grayeyes's argument that the court erred in relying on section 78B-5-825. This statute does not impose an unconstitutional limitation on Utah courts' authority to award attorney fees under general equitable principles. Our definition of "good faith" as used in the statute encompasses actions filed "vexatiously, wantonly, or for oppressive reasons." Having concluded that there is no bad-faith basis for an award of fees, we turn to Grayeyes's argument under the private attorney general doctrine.

### B. *Even Assuming Its Continued Vitality, the Private Attorney General Doctrine Would Not Apply Here*

¶48 Grayeyes argues that the district court erred in denying him attorney fees under the private attorney general doctrine. To support this claim, he argues that by disavowing the private attorney general doctrine the Utah Legislature unconstitutionally interfered in the judiciary's authority to regulate the practice of law. But, even assuming that to be true, Grayeyes would not be entitled to attorney

---

[32] *In re Discipline of Sonnenreich*, 2004 UT 3, ¶ 48, 86 P.3d 712 (alteration in original) (citation omitted) (internal quotation marks omitted).

[33] *Vexatious*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/vexatious (last visited Sept. 14, 2021).

[34] *Wanton*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/wanton (last visited Sept. 14, 2021).

[35] *Oppressive*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/oppressive (last visited Sept. 14, 2021.

fees. So we affirm the district court's denial of fees under the private attorney general doctrine.

¶49 "As a general rule, Utah courts award attorney fees only to a prevailing party, and only when such action is permitted by either statute or contract."[36] But "[t]he absence of such authority . . . does not bar the court from awarding attorney fees 'when it deems it appropriate in the interests of justice and equity.'"[37] We have held that an award of attorney fees may be justified in cases "in which the nonprevailing party acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons.'"[38]

¶50 On rare occasions in the past, we have also awarded fees according to the private attorney general doctrine, under which a court may award fees to a plaintiff who "vindicat[es] . . . a strong or societally important public policy" in a way that "transcend[s] the individual plaintiff's pecuniary interest . . . ."[39] We first recognized this exception to the general rule in *Stewart v. Utah Public Service Commission*, in which the plaintiffs prevailed in challenging an order of the Public Service Commission which had unlawfully increased the rates it charged for a public utility.[40] We concluded that an award of attorney fees was appropriate because the plaintiffs, "a handful of ratepayers acting entirely on their own," had "successfully vindicated an important public policy benefitting all of the ratepayers in the state."[41] They had gone beyond their own "pecuniary interest" and "conferred substantial benefits on all . . . ratepayers" in the state.[42] We noted, however, that this was an "exceptional" case, and observed that "any future award of attorney fees under [the private attorney general] doctrine [would] take an equally extraordinary case."[43]

---

[36] *Drezga*, 2009 UT 60, ¶ 32.

[37] *Id.* (quoting *Stewart*, 885 P.2d at 782).

[38] *Id.* (quoting *Stewart*, 885 P.2d at 782.).

[39] *Stewart*, 885 P.2d at 783 (citation omitted).

[40] *Id.* at 784.

[41] *Id.* at 783.

[42] *Id.*

[43] *Id.* at 783 n.19.

¶51 The only other case in which we have awarded fees under this doctrine is *Utahns for Better Dental Health-Davis, Inc. v. Davis County Clerk*.[44] We concluded that a nonprofit group was entitled to fees after it vindicated Davis County citizens' right to legislate via initiative in the face of unlawful interference by the county clerk.[45] During the 2000 general election, a majority of Davis County voters supported an initiative to add fluoride to the local water supply.[46] After the election, a group of residents opposed to fluoride filed a petition to have a revote.[47] In response to the petition, the county clerk decided to include a revote question on the ballot during the next general election.[48] A nonprofit group, Utahns for Better Dental Health-Davis, challenged the clerk's decision and prevailed, arguing that the revote initiative was unconstitutional and therefore should not be included on the ballot.[49]

¶52 Considering whether the nonprofit group was entitled to fees, we explained that, "[i]n private attorney general cases, the threshold issue is a rather transcendent, large picture question of public policy, namely, whether an important right affecting the public interest has been vindicated."[50] We concluded that the plaintiffs had met this threshold because their case "implicated the sacrosanct and fundamental right of the people to directly legislate through the constitutional processes of initiative and referenda."[51] The nonprofit group had vindicated that right by successfully challenging the county clerk's unlawful interference with that right.[52]

---

[44] 2007 UT 97, 175 P.3d 1036.

[45] *Id.* ¶¶ 9–10.

[46] *Id.* ¶ 2.

[47] *Id.*

[48] *Id.*; *see* UTAH CODE § 20A–7–501(3)(d) (stating "[i]f a county . . . takes no action on a proposed law, the county clerk shall submit the proposed law to the voters of the county at the next regular general election").

[49] *Utahns for Better Dental Health-Davis*, 2007 UT 97, ¶ 3.

[50] *Id.* ¶ 8.

[51] *Id.* ¶ 9.

[52] *Id.* ¶ 10.

¶53 The Utah Court of Appeals has awarded fees under the private attorney general doctrine only once, in *Culbertson v. Board of County Commissioners of Salt Lake County*.[53] In that case, two individuals challenged Salt Lake County's authorization of a private development project in conflict with its own ordinances.[54] The court of appeals concluded that an award of fees was warranted because, although the plaintiffs personally wanted the development project to fail, they had also "vindicated an important public policy" by "curbing the County's *willful disregard* of its own ordinances and procedures."[55] The court of appeals so concluded because "courts in other jurisdictions have found" that the public has an interest in thwarting the illegal conduct of a local governing body.[56]

¶54 But the private attorney general doctrine's moment in the sun was short-lived.[57] The legislature explicitly disavowed it in Utah Code section 78B-5-825.5, which states that "[a] court may not award attorney fees under the private attorney general doctrine in any action filed after May 12, 2009." Notwithstanding this, Grayeyes asked the district court to award him fees under the private attorney

---

[53] 2008 UT App 22, 177 P.3d 621. In one other case, the court of appeals did not award fees because it remanded for further consideration of whether the "'necessary costs of litigation . . . transcend[ed] [plaintiffs'] pecuniary interest' to a degree that warrants attorney fees" under the private attorney general doctrine. *Highlands at Jordanelle, LLC v. Wasatch Cnty.*, 2015 UT App 173, ¶ 40, 355 P.3d 1047 (citation omitted). In reaching that result, however, the court of appeals concluded that the plaintiffs had vindicated an important public policy by challenging a fire district's charging of local developers for unauthorized fire-protection fees. *Id.* ¶ 36. We do not address this case because it does not depart from the court of appeals' approach in *Culbertson* in a way that is material to our analysis.

[54] *Culbertson*, 2008 UT App 22, ¶ 3.

[55] *Id.* ¶¶ 11, 13.

[56] *Id.* ¶ 14.

[57] To be clear, we mean that the doctrine's moment in the sun is over only in the sense that it has been explicitly disavowed by the legislature. We do not address the constitutionality of that disavowal.

general doctrine, arguing that the legislature's disavowal of the doctrine was unconstitutional.

¶55  In his application for fees, Grayeyes presented two grounds for an award of fees under the private attorney general doctrine. First, he argued that he had vindicated an important public policy by demonstrating that he was a resident of San Juan County under the election code despite not residing in one fixed abode, "establish[ing] an important precedent under the Utah elections code with peculiar benefit to a racially distinct minority in San Juan County," Native Americans.[58] Second, Grayeyes argued that he had "preserved the democratic choice by most voters in the 2018 election" in defending himself against Laws's challenge to his qualifications to hold office.

¶56  The district court concluded that the legislature's disavowal of the doctrine was constitutional, and, regardless, an award of attorney fees was not warranted. The district court noted that this "case [was] specific to one person and his qualification for office based on his residency"; unlike in *Stewart,* there were "no similarly-situated defendants that would benefit from this litigation." It "was a straightforward election challenge authorized by statute."

¶57 On appeal, Grayeyes argues that we should disregard the district court's consideration of the merits of his application for fees under the private attorney general doctrine because the court had already concluded the legislature's disavowal of this doctrine was constitutional. In his view, we should hold the disavowal unconstitutional and remand for development of the record on this issue. We disagree. Even assuming the vitality of the private attorney general doctrine, both of Grayeyes's preserved grounds for an award of fees under the doctrine are unavailing. We address and reject each of those grounds in turn.

¶58 First, Grayeyes argues that he has vindicated an important public policy by "establish[ing] an important precedent" regarding the election code's residency requirement. But in concluding that Laws lacks standing, we affirm the district court without reaching the correctness of its decision regarding Grayeyes's residency. Had the district court correctly concluded that Laws lacked standing, it would not have reached this either. As explained above, we therefore vacate the district court's decision regarding the election code's residency requirement. In other words, although Grayeyes

---

[58] *See supra* ¶ 18.

prevails on appeal, he has not secured the result he presented as a ground for an award of fees below.

¶59 Second, Grayeyes argues he has vindicated an important public policy in seeking to "preserve the democratic choice by most voters" in the county. Granted, enough registered voters in San Juan County cast their votes for Grayeyes to secure his election as county commissioner. And, in defending his election to office, Grayeyes has sought to preserve that result—one that many members of the public apparently wanted. But there can be no vindication of an important public policy where there is no unlawful interference.

¶60 All three of the cases in which we or the court of appeals awarded fees under the private attorney general doctrine involved a challenge to unlawful government conduct. And in all three of these cases, someone stepped in on behalf of the public to challenge that unlawful conduct. But Laws's election challenge was not unlawful. Although we conclude that Laws lacks standing, his election challenge was otherwise explicitly authorized by statute.[59] So Grayeyes, in successfully defending his qualifications to hold office, has not thwarted an unlawful interference with the public's right to vote.

¶61 Moreover, this case is not about whether Grayeyes received a majority of votes. Laws initiated this lawsuit to challenge Grayeyes's qualifications to hold office. And while the right to vote is sacrosanct, it does not include the right to elect an unqualified candidate.[60] So, to "preserve the democratic choice" of most voters, Grayeyes would need to demonstrate that he is qualified to hold

---

[59] *Supra* ¶ 35; *see* UTAH CODE § 20A-4-403(1) ("[A] registered voter shall contest the right of any person declared elected to any office by filing a verified written complaint with the district court of the county in which he resides within 40 days after the canvass.").

[60] *See* UTAH CODE § 20A-4-402(1)(b) (including as grounds for challenging an election that "the person declared elected was not eligible for the office at the time of the election"); *id.* § 20A-4-406(2) ("Whenever an election is . . . set aside by the judgment of a court . . . the certificate of election . . . is void, and the office is vacant."); *id.* § 20A-1-508(3)(b)(i) (In the event of a vacancy, "[t]o appoint an interim replacement, the county legislative body shall . . . give notice of the vacancy to the party liaison of the same political party of the prior office holder and invite that party liaison to submit the name of an individual to fill the vacancy.").

office. But because we decide this appeal on narrow grounds, Grayeyes has secured a narrow victory: In the end, Grayeyes has demonstrated only that Laws lacks standing. This victory is specific to him in this case. The mere existence of parties not in court who want Grayeyes to succeed does not elevate this case to the realm of the private attorney general doctrine.

¶62 In summary, assuming the continued vitality of the private attorney general doctrine, we reject both of Grayeyes's preserved justifications for fees. Because we conclude that Laws lacks standing, we vacate the district court's decision regarding the election code's residency requirement. So we reject Grayeyes's argument that he has secured an important precedent for Native Americans in San Juan County. We also conclude that Grayeyes has not vindicated an important public policy in defending himself in this case because he has not thwarted an unlawful government action and his victory is specific to him.

¶63 Because, as explained above, Grayeyes is also not entitled to fees under his bad-faith argument, we affirm the district court's denial of fees.

## Conclusion

¶64 Laws has not alleged a sufficiently particularized injury to support traditional standing. And because he has not adequately briefed the issue of whether statutory standing can be sufficient on its own, we conclude he lacks standing to challenge Grayeyes's election as county commissioner and dismiss this claim.

¶65 We also reject Grayeyes's argument that the district court erred in denying his application for attorney fees. We reject his argument that the court erred in relying on section 78B-5-825. This statute does not impose an unconstitutional limitation on courts' authority to award fees according to general equitable principles. And Grayeyes would not be entitled to fees under the private attorney general doctrine, even assuming its continuing vitality, because he has not conferred a significant benefit to the public as a result of defending himself in this case. So we affirm the decision of the district court.

————————

LEE, A.C.J., concurring in part and concurring in the judgment

ASSOCIATE CHIEF JUSTICE LEE, concurring in part and concurring in the judgment:

¶66 I agree with the majority's determination that Kelly Laws failed to identify the kind of private injury that is necessary to the establishment of his standing as a plaintiff in this case. I also agree with its conclusion that Willie Grayeyes failed to establish a basis for an award of attorney fees under the "private attorney general doctrine" set forth in a body of case law.

¶67 I concur in the opinion of the court on the first point but only the judgment of the court on the second.[61] And I write separately to (1) elaborate on the basis for dismissal of this case on standing grounds in light of questions raised in the concurring opinion of Justice Pearce; and (2) identify an alternative ground for denial of Grayeyes's request for attorney fees.

I

¶68 This is a public rights action filed by a private party. The plaintiff (Laws) initiated it in an attempt to vindicate a societal interest in assuring compliance with Utah election law. He identified no private interest in the disposition of the case and sought no remedy that was specific to any such interest. He lacks standing on that basis. *See supra* ¶ 30 (concluding that Laws lacks standing because he is seeking to vindicate an interest shared by "all registered voters in San Juan County").

¶69 Justice Pearce writes separately to "question the suggestion that the Utah Constitution might prevent the Utah Legislature from granting standing to a plaintiff who cannot meet 'traditional' standing requirements." *Infra* ¶ 77. He suggests that (1) our cases have relied too much on "federal and secondary sources that don't tell us much about the meaning of the Utah Constitution"; (2) the doctrine of "public interest standing" may undermine any "requirement that a plaintiff . . . demonstrate a 'particularized injury' different from other 'members of the public at large'"; and (3) there may be no logical or textual basis for "any assumption that separation of powers concerns bar the Legislature from statutorily granting standing." *Infra* ¶¶ 78–80. And he accordingly questions the majority's conclusion "that the Utah Constitution might prevent the

---

[61] I also concur in the majority's analysis of Grayeyes's request for attorney fees under Utah Code section 78B-5-825. I thus concur in Parts I and II.A. of the majority opinion but not in Part II.B.

LEE, A.C.J., concurring in part and concurring in the judgment

Utah Legislature from granting standing to a plaintiff who cannot meet 'traditional' standing requirements." *Infra* ¶ 77.

¶70 The essence of my response is set forth in my opinions in *Gregory v. Shurtleff*, 2013 UT 18, 299 P.3d 1098, and *In re Gestational Agreement*, 2019 UT 40, 449 P.3d 69. There, I acknowledged that the Utah Constitution lacks a "case or controversy" clause but established that it nonetheless limits our courts to the exercise of "judicial power"—as by the issuance of "writs" and the disposition of "cases." *In re Gestational Agreement*, 2019 UT 40, ¶¶ 163–65, (Lee, A.C.J., concurring); *Gregory*, 2013 UT 18, ¶¶ 69, 73–74 (Lee, J., concurring in part and dissenting in part). And I demonstrated that the historical understanding of the judicial power limits "private plaintiffs" to the vindication of "private rights" while reserving the protection of "public rights" to "government representatives suing for the public in court." *Gregory*, 2013 UT 18, ¶¶ 70, 90 (Lee, J., concurring in part and dissenting in part). On this basis, I also asserted that this court's doctrine of "public interest standing" is incompatible with the original understanding of the judicial power under the Utah Constitution. *Id.* ¶ 105.

¶71 These are still my views. Laws lacks standing not because our Utah doctrine of standing must "mimic[] the one the U.S. Supreme Court imposes through its interpretation of the federal constitution," *infra* ¶ 77, but because our courts lack the power to resolve a public rights action filed by a private party. This is a core tenet of the longstanding limits on our judicial power. I see no basis for setting it aside.[62]

---

[62] I will refrain from restating points I have developed in detail in prior cases. I note my disagreement, however, with the suggestion that my approach is in any way called into question by the opinions in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021). Both the majority and dissenting opinions in *TransUnion* reinforce my central point. They agree that courts have long held that injury to a "concrete," "private" interest is required to sustain standing for a private plaintiff. *See id.* at 2204 (holding that a private plaintiff has standing to seek redress for an "injury" that "has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts" (citation and internal quotation marks omitted)); *id.* at 2217 (Thomas, J., dissenting) (stating that historically, "whether a court possessed judicial power over an action with no showing of actual damages depended on whether the

(Continued)

LEE, A.C.J., concurring in part and concurring in the judgment

II

¶72 Grayeyes sought attorney fees under a body of case law establishing a "private attorney general doctrine." Yet the legislature overruled that case law. It expressly provided that "[a] court may not award attorney fees under the private attorney general doctrine in any action filed after May 12, 2009." UTAH CODE § 78B-5-825.5.

---

plaintiff sought to enforce a right held privately by an individual or a duty owed broadly to the community"); *id.* at 2220 (Thomas, J., dissenting) ("Vindicating the *public* interest . . . is the function of [the legislative and executive branches]. The province of the court, in contrast, is, solely, to decide on the rights of individuals." (emphasis in original) (citations and internal quotation marks omitted)).

The disagreement between the majority and dissent in *TransUnion* is about an issue not before us here—as to the effect of a legislative establishment of a concrete, private interest. The majority refused to treat such a legislative determination as conclusive, holding that the "concrete-harm requirement" may be "difficult to apply" but is nonetheless essential even where Congress seeks to establish a statutorily defined private injury. *See id.* at 2206–07. And the dissent saw that narrow point differently. It suggested that the "test should be clear" in that "[s]o long as a statute fixes a minimum of recovery" for infringement of a private, statutory right, there should be "no doubt of the right of one who establishes a technical ground of action to recover this minimum sum . . . ." *Id.* at 2218 (Thomas, J., dissenting) (asserting that "courts for centuries held that injury in law *to a private right* was enough" to establish standing) (emphasis added)). Even the dissent, however, was not suggesting that a private plaintiff had standing to sue for injury inflicted on the public at large, or implying that the legislature had the power to confer such standing. It openly stated the contrary. *See id.* at 2217 (Thomas, J., dissenting) (noting that more than "legal injury" was required historically "where an individual sued based on the violation of a duty owed broadly to the whole community").

The *TransUnion* dissent accordingly was not asserting "that a legislative body may statutorily" establish private standing for any and all injuries recognized by statute. *Infra* ¶ 111 n.67. It was simply crediting the statutory recognition of a private, concrete injury as constitutionally sufficient. That question is not presented in a case like this one, which involves a diffused, public injury. And the *TransUnion* opinions thus do not undermine the holding reached by the majority in this case.

LEE, A.C.J., concurring in part and concurring in the judgment

¶73 Grayeyes challenges the constitutionality of this statute and asks us to reinvigorate and apply the private attorney general doctrine to this case. The majority obliges in part. It assumes for the sake of argument that the doctrine survives the statute. But it holds that Grayeyes is not entitled to a fee award as a private attorney general because he has secured a "victory" (through dismissal on standing grounds) that "is specific to him in this case." *Supra* ¶ 61.

¶74 I would approach the matter differently. I would decide the threshold question of whether the private attorney general doctrine survives the enactment of the statute. Because Grayeyes has failed to carry his burden of establishing a basis for striking the statute down as unconstitutional, I would uphold the statute and conclude that he has not established a basis for application of a case-based standard for a fee award.

¶75 Grayeyes asserts that the legislature's disavowal of the private attorney general doctrine is an unconstitutional interference with the judiciary's power to regulate the practice of law under *Injured Workers Association of Utah v. State*, 2016 UT 21, 374 P.3d 14. But the cited opinion does not support his position. In *Injured Workers* we "stress[ed]" that our analysis was "limited to legislative attempts to regulate the attorney client relationship." *Id.* ¶ 34 n.7. And we expressly noted that the legislature retains the power to regulate the award of attorney fees as a remedy in litigation. *Id.*

¶76 *Injured Workers* thus has no application here. And Grayeyes has accordingly failed to carry his burden of establishing a basis for invoking a case-law basis for his fee award notwithstanding the enactment of Utah Code section 78B-5-825.5. I would deny his fee request on that basis.

————

PEARCE, J., concurring in part and concurring in the judgment

JUSTICE PEARCE, concurring in part and concurring in the judgment:

¶77 I concur in the result the majority opinion reaches. I acknowledge that the majority does not explicitly answer the question of whether the Legislature can confer standing on a plaintiff who does not meet the requirements for traditional standing. *See supra* ¶ 37 ("[W]e decline to rely on dicta from *Morgan* to resolve the question of whether the Utah Legislature . . . intended to grant standing to a plaintiff by statute when that plaintiff has not met the requirements for traditional standing."). And I concur in the majority's conclusion that Greyeyes has not provided this court with sufficient briefing to resolve that issue. *See supra* ¶ 37. But I write separately, as I did in *In re Gestational Agreement*, 2019 UT 40, ¶¶ 56–98, 449 P.3d 69 (Pearce, J., concurring), because I have serious doubts about the extent to which the Utah Constitution requires a standing test that mimics the one the U.S. Supreme Court imposes through its interpretation of the federal constitution. And that causes me to question the suggestion that the Utah Constitution might prevent the Utah Legislature from granting standing to a plaintiff who cannot meet "traditional" standing requirements.

¶78 I question that suggestion for three reasons. First, a dive into our standing jurisprudence reveals a problematic reliance on federal and secondary sources that don't tell us much about the meaning of the Utah Constitution.

¶79 Second, I cannot reconcile a requirement that a plaintiff must demonstrate a "particularized injury" different from other "members of the public at large," *supra* ¶¶ 28, 31 (citations omitted), with this court's recognition of public interest standing as an alternative to "traditional" standing. *See Gregory v. Shurtleff*, 2013 UT 18, ¶¶ 13–15, 299 P.3d 1098.

¶80 Third, I question the logic and textual basis underlying any assumption that separation of powers concerns bar the Legislature from statutorily granting standing. *See supra* ¶¶ 33, 37.

¶81 As a starting point, it is helpful to remember the different origins of federal and state standing doctrines. Federal standing requirements stem from the language of Article III, Section 2 of the U.S. Constitution, which provides that "[t]he Judicial Power shall extend to" certain types of "Cases" and "Controversies." *See also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (explaining that "the core component of standing" in federal courts—injury, causation, and redressability—"is an essential and unchanging part of the case-or-controversy requirement of Article III"); *TransUnion LLC v.*

PEARCE, J., concurring in part and concurring in the judgment

*Ramirez*, 141 S. Ct. 2190, 2203 (2021) (explaining that traditional standing, or "Art. III standing[,] is built on a single basic idea—the idea of separation of powers," which comes from the language of Article III "confin[ing] the federal judicial power to the resolution of 'Cases' and 'Controversies'" (citation omitted)).

¶82 Federal standing requirements do not bind state courts. The U.S. Supreme Court has recognized on multiple occasions that "the constraints of Article III do not apply to state courts, and accordingly the state courts are not bound by the limitations of a case or controversy or other federal rules of justiciability even when they address issues of federal law." *ASARCO Inc. v. Kadish*, 490 U.S. 605, 617 (1989) (holding that it was the "right" of Arizona state courts to take "no account of federal standing rules" in state court, even on a matter interpreting federal law); *see City of Los Angeles v. Lyons*, 461 U.S. 95, 113 (1983) ("[S]tate courts need not impose the same standing or remedial requirements that govern federal court proceedings.").

¶83 The majority opinion acknowledges, as we have in the past, that unlike the federal constitution, "the Utah Constitution includes no . . . express limitation [on Utah courts' jurisdiction]." *See supra* ¶ 33 (alteration in original) (quoting *Brown v. Div. of Water Rts. of Dep't of Nat. Res.*, 2010 UT 14, ¶ 12, 228 P.3d 747); *see also Shurtleff*, 2013 UT 18, ¶ 12 ("'Unlike the federal system, the judicial power of the state of Utah is not constitutionally restricted by the language of Article III of the United States Constitution requiring "cases" and "controversies," since no similar requirement exists in the Utah Constitution.'" (quoting *Jenkins v. Swan*, 675 P.2d 1145, 1149 (Utah 1983)). That is, we all agree that the Utah Constitution omits the language that federal courts have used to justify the imposition of standing requirements.

¶84 Despite that omission, we have nevertheless sometimes talked, as the majority does here, as if the Utah Constitution somehow anticipated and incorporated the evolving federal standing jurisprudence. *See supra* ¶¶ 33–34, 37. For example, the majority states that, to ensure compliance with separation of powers principles, "we require a plaintiff to demonstrate a personal stake in the outcome of a dispute." *See supra* ¶ 34 (citing *Jenkins*, 675 P.2d at 1149; *Soc'y of Pro. Journalists, Utah Chapter v. Bullock*, 743 P.2d 1166, 1170 (Utah 1987); *Terracor v. Utah Bd. of State Lands & Forestry*, 716 P.2d 796, 799 (Utah 1986)). And the majority describes a three-part test for "traditional standing" that includes injury, causation, and redressability, which resembles the federal courts' standing test. *Compare supra* ¶ 27 (quoting *S. Utah Wilderness All. v. San Juan Cnty.*

PEARCE, J., concurring in part and concurring in the judgment

*Comm'n*, 2021 UT 6, ¶ 14, 484 P.3d 1160), *with Lujan*, 504 U.S. at 560–61. As detailed below, there are reasons to believe that the Utah Constitution may not actually impose these standing requirements, and that the better way to view them are as prudential standards that we generally impose upon would-be litigants.

## I. THE EVOLUTION OF OUR STANDING DOCTRINE

¶85 This court has at times described standing in general, and traditional standing in particular, as a requirement the Utah Constitution imposes. *See, e.g.*, *Brown v. Div. of Water Rts. of Dep't of Nat. Res.*, 2010 UT 14, ¶ 12, 228 P.3d 747. But if we hunt that idea back to its roots, we find a shaky foundation, rife with inconsistencies and unanswered questions about whether the Utah Constitution actually *requires* traditional standing as a "jurisdictional prerequisite." *See In re Gestational Agreement*, 2019 UT 40, ¶ 60, 449 P.3d 69 (Pearce, J., concurring).

¶86 The authority we cite for the proposition that Utah's standing doctrine has constitutional origins can be traced primarily to *Jenkins v. Swan*, 675 P.2d 1145, 1149 (Utah 1983), *Baird v. State*, 574 P.2d 713, 717 (Utah 1978), and a case they both cite, *Lyon v. Bateman*, 228 P.2d 818, 820–21 (Utah 1951).[63]

---

[63] These cases echo largely unexamined throughout our jurisprudence. For example, when we said in *Brown* that the Utah Constitution "mandates certain standing requirements," 2010 UT 14, ¶ 12, we relied on *Jenkins*, 675 P.2d at 1149. In turn, *Jenkins* relied on *Baird*, 574 P.2d at 717, and multiple federal cases. *See Jenkins*, 675 P.2d at 1149–50.

Similarly, when we cautioned in *Society of Professional Journalists, Utah Chapter v. Bullock* that omitting traditional standing requirements risks inserting courts into disputes "more appropriately directed to the legislative and executive branches," 743 P.2d 1166, 1170 (Utah 1987), we were quoting *Jenkins*, 675 P.2d at 1149.

And in *Terracor v. Utah Board of State Lands & Forestry*, when we discussed the "separation of powers" roots of our "standing law" and said we will "not lightly dispense with the requirement that a litigant have a personal stake in the outcome of a specific dispute," 716 P.2d 796, 798–99 (Utah 1986), we relied on *Jenkins*, 675 P.2d at 1150, and *Baird*, 574 P.2d at 717. We also relied on federal cases. *See Terracor*, 716 P.2d at 798–99.

PEARCE, J., concurring in part and concurring in the judgment

¶87 The plaintiffs in *Jenkins*, *Baird*, and *Lyon* all sought relief under Utah's declaratory judgment statute. *See Jenkins*, 675 P.2d at 1148; *Baird*, 574 P.2d at 715; *Lyon*, 228 P.2d at 821. That statute provides:

> A person . . . whose rights, status, or other legal relations are affected by a statute . . . may request the district court to determine any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status, or other legal relations.

UTAH CODE § 78B-6-408.

¶88 In the oldest of these cases, *Lyon*, we stated that when dealing with "statutes authorizing courts to render declaratory relief," courts "must operate within the constitutional and statutory powers and duties imposed upon them." *Lyon*, 228 P.2d at 820. We observed,

> Generally, courts have held that the conditions which must exist before a declaratory judgment action can be maintained are: (1) a justiciable controversy; (2) the interests of the parties must be adverse; (3) the party seeking such relief must have a legally protectible interest in the controversy; and (4) the issues between the parties involved must be ripe for judicial determination.

*Id.* at 820–21.

¶89 We provided no citation for that test, but it appears we lifted it directly from a treatise that does not focus on Utah law and makes no reference to the Utah Constitution. *See* WALTER H. ANDERSON, ACTIONS FOR DECLARATORY JUDGMENTS § 42, at 125 (1940) (hereinafter ANDERSON (1940)) (providing a nearly identical four-part test for obtaining declaratory relief). *Lyon* also quotes a passage from that treatise—which in turn relies on a U.S. Supreme Court case interpreting federal law—to elaborate on the "type of justiciable controversy which must exist before declaratory relief can be granted" and to define "controversy" based on "the sense in which the word is used in the Constitution in defining judicial power, particularly of the Federal Courts." *Lyon*, 228 P.2d at 821 (quoting ANDERSON (1940), *supra* ¶ 89, § 8, at 27 (citing *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227 (1937))).

¶90 In other words, in *Lyon*, we reached our conclusions about the purported "constitutional" "controversy" requirements associated with declaratory judgments without acknowledging that the Utah Constitution contains no case and controversy requirement.

PEARCE, J., concurring in part and concurring in the judgment

Nor did we attempt to analyze what the omission of that language might mean. We likewise failed to examine the explicit separation of powers clause found in article V, section 1 of the Utah Constitution. Instead of analyzing our constitution to discover what our constitution requires, we pulled a treatise off the shelf—a treatise that primarily interprets the federal Declaratory Judgment Act, the federal constitution, and their application in federal courts. *See* ANDERSON (1940), *supra* ¶ 89, § 7, at 26 (citing *Aetna Life Ins. Co.*, 300 U.S. 227). As such, we talked about constitutional requirements without ever considering our constitution.

¶91 We took a similar route to reach similar conclusions in *Baird*. In *Baird,* we relied heavily on the above-discussed treatise to interpret the phrase "rights, status and other legal relations" in Utah's declaratory judgment statute. *See* 574 P.2d at 715 (citation omitted). We opined that language evinced a legislative intent to require "a justiciable controversy where there is an actual conflict between interested parties asserting adverse claims on an accrued state of facts as opposed to a hypothetical state of facts." *Id.* (citing 1 ANDERSON, DECLARATORY JUDGMENTS § 9, at 13 (2d ed., 1959 Supp.) (hereinafter ANDERSON (1959)). In other words, we used the Anderson treatise to support a conclusion about what the Utah Legislature intended *the state statute* to require.

¶92 Further following Anderson's lead, we said that the statute "recognizes the constitutional limitations upon the courts to determine only cases and controversies." *Id.* at 716 (citing ANDERSON (1959), *supra* ¶ 89, § 9, at 49–50). And we again cited Anderson when we tied standing requirements for declaratory judgments to "[j]udicial adherence to the doctrine of separation of powers." *Id.* (citing ANDERSON (1959), *supra* ¶ 89, § 16, at 65–66). We also cited a federal case to support our reasoning that allowing a "generalized grievance" would improperly "cast the courts in the role of supervising the coordinate branches of government." *Id.* at 717 (citing *United States v. Richardson*, 418 U.S. 166, 177–80 (1974), and *id.* at 188–92 (Powell, J. concurring)). That means that *Baird* reached its conclusions about the purported "constitutional" "controversy" limitations of Utah's declaratory judgment statute without ever acknowledging, let alone analyzing, the absence of a "cases and controversies" requirement in Utah's constitution.

¶93 In *Jenkins*, we repeated the four-part test we had described in *Baird* and *Lyon. Jenkins*, 675 P.2d at 1148; *see also supra* ¶ 88. And we interpreted the second and third elements—requiring adversity between parties and that the party seeking relief have a "legally protectible interest in the controversy"—as "represent[ing] the

PEARCE, J., concurring in part and concurring in the judgment

traditional test for standing." *Id.* We then went on to discuss the role that "separation of powers" plays in requiring a "personal stake in the outcome of a legal dispute." *See id.* at 1148–50. In doing so, we primarily relied on federal cases interpreting federal law. *See id.* at 1149 (citing *Flast v. Cohen*, 392 U.S. 83 (1968), and *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464 (1982)). Even though we were focused on separation of powers principles, we entirely failed to account for the Utah Constitution's express separation of powers provision. Indeed, we did not even consider that the Utah Constitution has a distribution of powers article.

¶94 In sum, *Lyon*, *Baird*, and *Jenkins* all appear to rely on the Anderson treatise and federal law to support their conclusions about standing requirements for plaintiffs seeking declaratory judgments. And they left the text of Utah's own constitution unexamined. We should therefore approach those cases' conclusions about what the Utah Constitution requires with a healthy amount of skepticism.

¶95 Moreover, it is not clear that we intended *Lyon*, *Baird*, and *Jenkins* to apply to all claims and causes of action in the State of Utah. *Lyon*, *Baird*, and *Jenkins* involved plaintiffs who invoked the declaratory judgment statute to seek declarations that various government actions violated the Utah Constitution or statutes. And, to varying degrees, those cases interpreted the declaratory judgment statute's language. None of those cases involved statutes that explicitly granted standing to a plaintiff. *See Jenkins,* 675 P.2d at 1152 (observing that the substantive statutes Jenkins sought to enforce did "not provide Jenkins with standing to act as a private attorney general in the enforcement of this statute"); *Baird,* 574 P.2d at 715–17 (plaintiff sought declaration that a statute violated constitutional separation of powers and due process principles); *Lyon*, 228 P.2d at 820–21 (plaintiff challenged the validity, but not the constitutionality, of the governor's veto of certain school funds).

¶96 This causes me to question the utility of those cases as a guide to understand what is statutorily required outside of the declaratory judgment context, let alone what might be constitutionally required in other situations. It also causes me to question whether they have much to say about whether the Legislature can grant statutory standing to those who might not meet traditional standing requirements.

¶97 As I focus on this question, I find myself increasingly troubled by the fact that, in more recent cases, we have taken the language from *Jenkins* to support imposing standing requirements on litigants without recognizing that *Jenkins* interpreted the

PEARCE, J., concurring in part and concurring in the judgment

declaratory judgment statute. *See, e.g., S. Utah Wilderness All. v. San Juan Cnty. Comm'n*, 2021 UT 6, ¶ 18, 484 P.3d 1160; *Brown*, 2010 UT 14, ¶ 12; *Washington Cnty. Water Conserv. Dist. v. Morgan*, 2003 UT 58, ¶ 6 n. 2, 82 P.3d 1125; *Soc'y of Pro. Journalists, Utah Chapter v. Bullock*, 743 P.2d 1166, 1170 (Utah 1987); *Terracor v. Utah Bd. of State Lands & Forestry*, 716 P.2d 796, 798–99 (Utah 1986). Before we extend *Jenkins* and *Baird* yet again, I believe it is incumbent upon us to conduct a more serious inquiry into the Utah Constitution.

¶98 I acknowledge that in *Southern Utah Wilderness Alliance v. San Juan County Commission* we said that, even "[w]here a plaintiff falls within a class protected by statute" and that statute provides the plaintiff "with a right to sue for violations of the [statute]," the court must still determine "whether the plaintiff has suffered 'some distinct and palpable injury that gives him a personal stake in the outcome of the legal dispute.'" 2021 UT 6, ¶¶ 17–18 (quoting *Jenkins*, 675 P.2d at 1148). And I acknowledge that I should have raised these concerns in that case as well. But for all the reasons discussed above, including that *Southern Utah Wilderness Alliance* relied on *Jenkins*, I strongly question whether we overstated the principle.

¶99 The majority responds that *Southern Utah Wilderness Alliance v. San Juan County Commission* "was consistent with established case law." *See supra* ¶ 27 n.8. To be clear, my concern is not that the majority opinion is out-of-step with what this court has sometimes said. My concern is that what this court has sometimes said is out-of-step with what the Utah Constitution requires.

¶100 But even the cases the majority cites demonstrate that we have often not treated traditional standing as a constitutional requisite. For example, in *Utah Chapter of Sierra Club v. Utah Air Quality Board*, we analyzed "associational standing." 2006 UT 74, ¶ 21, 148 P.3d. 960. That case reaffirmed the vitality of "alternative standing" when an "appropriate party" raises "issues of significant public importance." *Id.* ¶¶ 35, 41. Another case the majority cites similarly stands for the proposition that a party who cannot meet the traditional test can be granted alternative standing in appropriate circumstances. *See Hogs R Us v. Town of Fairfield,* 2009 UT 21, ¶ 9, 207 P.3d 1221. Our continued recognition of alternatives to traditional standing undermines any conclusion that Utah litigants are constitutionally required to meet traditional standing requirements, and that the Legislature cannot confer standing by statute.

¶101 I do not doubt that imposing standing requirements may reflect "[i]mportant jurisprudential considerations." *See Terracor*, 716 P.2d at 799. But whether our constitution *requires* traditional

PEARCE, J., concurring in part and concurring in the judgment

standing, particularly in the face of a statutory grant of standing, is another matter—one we have not, in my view, yet sufficiently supported. I continue to worry, as I expressed in *In re Gestational Agreement*, "that we risk equating statements regarding a 'general understanding' of our judicial power with a rule regarding what *must* exist before we can exercise that power." 2019 UT 40, ¶ 58 (Pearce, J., concurring) (citation omitted).

¶102 At some point, we are going to need to wrestle with the murky origins of our constitutional standing doctrine to sort out what the Utah Constitution actually requires. When we do, we will need to confront the fact that we have spoken inconsistently about standing, sometimes even within the same opinion. For example, in *Gregory v. Shurtleff*, we said both "that 'the Utah Constitution . . . mandates certain standing requirements, which emanate from the principle of separation of powers,'" 2013 UT 18, ¶ 12 n.4, 299 P.3d 1098 (quoting *Brown*, 2010 UT 14, ¶ 12), and also that "[s]tanding in the state courts is a judge-made doctrine." *Id.* ¶ 16 n.10 (quoting 59 AM. JUR. 2D *Parties* § 30 (2d ed. 2012)). And in *Terracor*, we said we will "not lightly dispense with the requirement that a litigant have a personal stake in the outcome of a specific dispute," 716 P.2d at 799, which implies that we could, in some situations, "dispense" with that requirement.

¶103 We are not the only supreme court that has needed to review its jurisprudence to ensure that it has not imposed conditions that its constitution does not demand. The Michigan Supreme Court undertook this exercise and concluded that there is "no support in either the text of the Michigan Constitution or in Michigan jurisprudence . . . for recognizing standing as a constitutional requirement or for adopting the federal standing doctrine." *Lansing Schs. Educ. Ass'n v. Lansing Bd. of Educ.*, 792 N.W.2d 686, 693 (Mich. 2010).[64]

¶104 *Lansing* is instructive. The *Lansing* court concluded that its state's constitution did not require adoption of the federal standing doctrine because the Michigan constitution lacked any reference to "cases" and "controversies." The court reasoned that unlike the Michigan Constitution, "the federal constitution enumerates the cases and controversies to which the judicial power extends, and the

---

[64] We recognized in *Shurtleff* that "[t]he same is true of Utah's constitution and jurisprudence." 2013 UT 18, ¶ 17 (discussing *Lansing Schs. Educ. Ass'n*, 792 N.W.2d at 693).

PEARCE, J., concurring in part and concurring in the judgment

federal standing doctrine is largely derived from this Article III case-or-controversy requirement." *Id.* at 694 (citing *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560 (1992) ("[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III.")). The court concluded "there is no textual basis in the Michigan Constitution for concluding that standing is constitutionally required." *Id.* at 693.

¶105 The Michigan high court also analyzed the different roles and powers of state and federal courts. The court explained that state "courts' judicial power to decide controversies was broader than the United States Supreme Court's interpretation of the Article III case-or-controversy limits on the federal judicial power because a state sovereign possesses inherent powers that the federal government does not." *Id.* at 694–95. "Whereas federal courts only have the powers enumerated in the United States Constitution, the states retain powers not ceded to the federal government." *Id.* at 694 (citing U.S. CONST. amend. X). Therefore, "strictly interpreting the judicial power of [state] courts to be identical to the federal court's judicial power does not reflect the broader power held by state courts." *Id.* at 694.

¶106 The *Lansing* court also acknowledged that the Michigan Constitution references "judicial power." *Id.* at 696. But the court concluded that phrase "does not inherently incorporate the federal case-or-controversy requirement, and, in fact, importing this requirement is inconsistent with this Court's historical view of its own powers and the scope of the standing doctrine." *Id.* The court also noted it was not alone in its conclusion, citing many other states that have rejected strict adoption of federal standing doctrine. *Id.* at 694 n.11.[65]

¶107 Even though the Michigan court rejected the notion that Michigan's Constitution *required* adoption of standing requirements similar to federal requirements, the court recognized certain standing requirements as a prudential matter. *See id.* at 699 ("We hold that Michigan standing jurisprudence should be restored to a

---

[65] For example, the Michigan court cited *Lebron v. Gottlieb Mem'l Hosp.,* 930 N.E.2d 895, 917 n.4 (Ill. 2010), which observed that, because the Illinois Constitution lacks an analog to the federal cases and controversies requirement, Illinois courts are "not required to follow federal law on issues of standing, and ha[ve] expressly rejected federal principles of standing."

PEARCE, J., concurring in part and concurring in the judgment

limited, prudential doctrine that is consistent with Michigan's long-standing historical approach to standing.").

¶108 Other states, such as Wisconsin, have also taken that approach. *See Foley-Ciccantelli v. Bishop's Grove Condo. Ass'n*, 797 N.W.2d 789, 799 n.18 (Wisc. 2011) ("Wisconsin courts evaluate standing as a matter of judicial policy rather than as a jurisdictional prerequisite."); *State ex rel. First Nat'l Bank of Wis. Rapids v. M & I Peoples Bank of Coloma*, 290 N.W.2d 321, 325 n.5 (Wis. 1980) (explaining that the doctrine of standing in Wisconsin "has generally been applied as a matter of 'sound judicial policy'" rather than a "jurisdictional prerequisite" because, unlike the federal constitution's limitations on federal courts' jurisdiction to "cases and controversies," the Wisconsin Constitution granted state courts jurisdiction "in all matters civil and criminal" (citations omitted)).[66]

---

[66] Many other states have come to similar conclusions, rejecting traditional standing as a constitutional requirement but still imposing some requirements as a prudential matter. For example, Arizona has recognized that "the question of standing in Arizona is not a constitutional mandate since [that state] ha[s] no counterpart to the 'case or controversy' requirement of the federal constitution." *Fernandez v. Takata Seat Belts, Inc.*, 108 P.3d 917, 919 (Ariz. 2005) (citation omitted). And, while Arizona ordinarily requires, as matter of "prudential or judicial restraint," that a plaintiff "allege a distinct and palpable injury," Arizona courts recognize an exception for "cases involving issues of great public importance that are likely to recur." *Id.* (citations omitted).

Alaska also subscribes to the notion that "[s]tanding in our state courts is not a constitutional doctrine; rather, it is a rule of judicial self-restraint," and it allows for "citizen-taxpayer standing" as well as "interest-injury" standing. *Ruckle v. Anchorage Sch. Dist.*, 85 P.3d 1030, 1034 (Alaska 2004) (alteration in original) (citation omitted); *see also Friends of Willow Lake, Inc. v. State, Dep't of Transp. & Pub. Facilities, Div. of Aviation & Airports*, 280 P.3d 542, 546 (Alaska 2012) (same, and also recognizing "third-party standing to raise the rights of a third person").

The Oregon Supreme Court has similarly held that because of the "text, historical context, and case law" interpreting the Oregon Constitution, which lacks a "cases" or "controversies" provision, "there is no basis for concluding that the court lacks judicial power to hear public actions or cases that involve matters of public interest that might otherwise have been considered nonjusticiable under

(Continued)

PEARCE, J., concurring in part and concurring in the judgment

¶109 The logic that Michigan, Wisconsin, and other states have employed, as well as the similarity of those state constitutions to ours, merits further exploration before we continue to transplant federal standing requirements into Utah jurisprudence and call them a constitutional imperative.

¶110 Even if we are tempted to conclude that the framers of the Utah Constitution somehow incorporated federal standards when they eschewed the language that gives rise to those standards, we may need to take a long and hard look at the history of federal standing jurisprudence before we automatically copy every interpretation the U.S. Supreme Court gives to the federal case and controversy requirement. For example, Justice Thomas called into question whether the history and origins of the U.S. Constitution truly support the U.S. Supreme Court's interpretation that an "injury in law," or an injury created by statute, is insufficient alone to confer standing. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2218–19 (2021) (Thomas, J., dissenting). Justice Thomas explained that "it was not until 1970—'180 years after the ratification of Article III'—that this Court even introduced the 'injury in fact' (as opposed to injury in law) concept of standing." *Id.* at 2219 (citation omitted). And, he continued, that "concept then was not even about constitutional standing; it concerned a *statutory* cause of action under the Administrative Procedure Act," and "[t]he Court later took this statutory requirement and began to graft it onto its constitutional standing analysis." *Id.*

¶111 Justice Thomas also opined,

> In light of this history, tradition, and common practice, our test should be clear: So long as a "statute fixes a minimum of recovery . . ., there would seem to be no doubt of the right of one who establishes a technical ground of action to recover this minimum sum without any specific showing of loss." While the Court today

prior case law," nor does the state constitution "*require* dismissal in public actions or cases involving matters of public interest" when a case is moot. *Couey v. Atkins*, 355 P.3d 866, 898–901 (Or. 2015) (en banc), *affirming with clarification Kellas v. Dep't of Corrections*, 145 P.3d 139, 143 (Or. 2006).

While it is beyond the scope of this opinion to conduct a full-scale review of all fifty states' standing jurisprudence, it is clear that many states share my skepticism of blindly applying federal standing rules to state courts.

PEARCE, J., concurring in part and concurring in the judgment

> discusses the supposed failure to show "injury in fact,"
> courts for centuries held that injury in law to a private
> right was enough to create a case or controversy.

*Id.* (alteration in original) (footnote omitted) (citation omitted).[67]

¶112 While we are in no position to answer this question in this case, it is clear that there is work to be done before we can be confident pronouncing what the Utah Constitution requires of those who seek redress from the judicial branch. And that is especially true where the Legislature confers standing on a potential plaintiff.

## II. UTAH ALREADY RECOGNIZES PUBLIC INTEREST STANDING AS AN ALTERNATIVE TO TRADITIONAL STANDING

¶113 Another reason why I may be skeptical of a conclusion that the Legislature cannot constitutionally grant standing springs from our continued recognition of public interest standing as an alternative to "traditional criteria" for standing. *See Gregory v. Shurtleff*, 2013 UT 18, ¶¶ 13–15, 299 P.3d 1098. And if this court can grant standing to a plaintiff who cannot demonstrate a particularized injury, I do not see the basis for denying the Legislature the same ability.

¶114 The majority asserts that a plaintiff must demonstrate a "particularized injury" different from other "member[s] of the public at large." *See supra* ¶¶ 28, 31 (citations omitted). But it is difficult to square that assertion with our repeated recognition that "[w]hile it is 'the usual rule that one must be personally adversely affected before

---

[67] Associate Chief Justice Lee's concurrence avers that Justice Thomas's arguments were focused on allowing standing where there has been a violation of a statutorily created "private" right. *See supra* ¶ 71 n.62. That observation misses my point. I draw attention to Justice Thomas's opinion in *TransUnion* not to support Utah's public interest standing doctrine but to argue that, before this court determines to mimic the federal standing doctrine in yet another context, we must grapple with the fact that the federal standing doctrine has been a moving target over time, particularly the injury-in-fact requirement. Even if Justice Thomas has a narrower view of standing than what the Utah Constitution embodies, his opinion supports the idea that a legislative body may statutorily create an injury that gives rise to standing. It also outlines why historical notions of federal judicial power and the role of the courts support that idea.

PEARCE, J., concurring in part and concurring in the judgment

he has standing to prosecute an action . . . . it is also true this Court may grant standing where matters of great public interest and societal impact are concerned.'" *Gregory*, 2013 UT 18, ¶ 12 (second alteration in original) (quoting *Jenkins v. State*, 585 P.2d 442, 443 (Utah 1978)).

¶115 Even the Anderson treatise—which this court relied upon when commenting that standing is a constitutional requirement in declaratory judgment cases, *see supra* ¶¶ 89–94—recognizes that "in cases wherein the question involved is of great public interest[,] [t]hen the rule requiring the existence of a justiciable controversy is not followed, or is relaxed." ANDERSON (1940), *supra* ¶ 89, § 9, at 43; *see also supra* ¶ 108 & n.66 (discussing other states that recognize alternatives to traditional standing). In light of this authority, it is difficult to understand why the Legislature could not, in an appropriate circumstance, create statutory standing.

III. SEPARATION OF POWERS AND STATUTORY STANDING

¶116 Finally, even if we assume that the Utah Constitution "mandates certain standing requirements, which emanate from the principle of separation of powers," *supra* ¶ 33 (quoting *Brown v. Div. of Water Rts. of Dep't of Nat. Res.*, 2010 UT 14, ¶ 12, 228 P.3d 747), I question the contention that separation of powers principles would bar the Legislature from statutorily granting standing, *see supra* ¶ 37.

¶117 As an initial matter, our cases that use separation of powers concerns to justify the imposition of traditional standing requirements have never considered a plaintiff with statutory standing. And the separation of powers considerations we have relied on to support the notion that a plaintiff must have traditional standing have less force when the Legislature grants that plaintiff standing.

¶118 For example, in *Jenkins v. Swan*, we expressed concern that "the airing of generalized grievances and the vindication of public rights are properly addressed to the legislature, a forum where freewheeling debate on broad issues of public policy is in order." 675 P.2d 1145, 1149–50 (Utah 1983). We also repeated the concerns we had expressed in *Baird v. State,* that "[t]o grant standing to a litigant, who cannot distinguish himself from all citizens, would be a significant inroad on the representative form of government, and cast the courts in the role of supervising the coordinate branches of government." *Id.* at 1150 (quoting *Baird v. State*, 574 P.2d 713, 717 (Utah 1978)). And we cautioned that "[a]n overstepping of appropriate restraints on judicial review" risked causing "head-on confrontations between the [judiciary] and representative branches

PEARCE, J., concurring in part and concurring in the judgment

of government" that "will not, in the long run, be beneficial to either." *Id.* (quoting *United States v. Richardson*, 418 U.S. 166, 188 (1974) (Powell, J., concurring)).

¶119 Although I tend to wonder whether we were a smidge hyperbolic when we made those pronouncements, even those hyperboles lose whatever potency they might have when the Legislature authorizes the plaintiff to seek judicial review. It is difficult to conjure the risk of "head-on confrontations" between the Legislature and the judiciary when, for example, the Legislature empowers the court to review a complaint a voter brings about the conduct of an election. It is likewise difficult to see how reviewing a claim about that election dispute is more "properly addressed to the legislature," to allow "freewheeling debate" on "public policy." *See id.*

¶120 Indeed, the Michigan Supreme Court has suggested that "adopting [traditional] standing as a constitutional doctrine potentially may even *violate* the separation of powers doctrine" under its state constitution, particularly where a statute confers standing upon a litigant. *Lansing Schs. Educ. Ass'n v. Lansing Bd. of Educ.*, 792 N.W.2d 686, 694 n.9 (Mich. 2010) (emphasis added) (citation omitted); *see also Nat'l Wildlife Fed'n v. Cleveland Cliffs Iron Co.*, 684 N.W.2d 800, 835–36 (Weaver, J., concurring in result) (arguing that application of a "judicial standing test" to persons with "legislatively conferred" standing "improperly enlarges the court's power at the expense of the Legislature's power, ironically violating the very 'constitutional architecture'" of separation of powers (citation omitted)).[68]

---

[68] It is also worth noting that the separation of powers clause in the Michigan Constitution bears similarities with Utah's. *Compare* MICH. CONST. art. 3, § 2 ("The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution."), *with* UTAH CONST. art. V, § 1 ("The powers of the government of the State of Utah shall be divided into three distinct departments, the Legislative, the Executive, and the Judicial; and no person charged with the exercise of powers properly belonging to one of these departments, shall exercise any functions appertaining to either of the others, except in the cases herein expressly directed or permitted.").

(Continued)

PEARCE, J., concurring in part and concurring in the judgment

¶121 Another reason I question the assumption that "the principle of separation of powers" might forbid the Legislature from granting standing is that the cases that could be used to support that assumption suffer from a fundamental problem: they do not undertake a serious analysis of the Utah Constitution's express separation of powers clause. They instead rely on ideas drawn from federal cases and a treatise focusing on declaratory judgments and federal law. *See supra* ¶¶ 85–94.

¶122 Although I will keep an open mind until we are presented with a case with focused briefing, I presently see nothing in the text of the Utah Constitution's separation of powers article that would prevent the Legislature from granting standing to a plaintiff who cannot meet the test for traditional standing. Article V, section 1 of the Utah Constitution states that "no person charged with the exercise of powers properly belonging to [the Legislative, Executive, or Judicial] departments, shall exercise any functions appertaining to either of the others, except in the cases herein expressly directed or permitted."

¶123 We have interpreted issues implicating article V, section 1 of the Utah Constitution as requiring a "relatively straightforward three-step inquiry":

> First, are the [state actors] in question "charged with the exercise of powers properly belonging to" one of the three branches of government? Second, is the function that the statute has given . . . one "appertaining to" another branch of government? The third and final step in the analysis asks: if the answer to both of the above questions is "yes," does the constitution "expressly" direct or permit exercise of the otherwise forbidden function? If not, article V, section 1 is transgressed.

*In re Young*, 1999 UT 6, ¶ 8, 976 P.2d 581.

¶124 We have also recognized that there are some "powers and functions which may, in appearance, have characteristics of an inherent function of one branch but which may be permissibly exercised by another branch." *Id.* ¶ 14. And we have held that "when the power exercised or the function performed is one that we determine is not *exclusive* to a branch, it is not 'appertaining to' that branch and does not fall within the reach of the second clause of

PEARCE, J., concurring in part and concurring in the judgment

article V, section 1." *Id.* (emphasis added); *see also id.* (referencing the terms "primary," "core," or "essential," in addition to "exclusive," in defining "appertaining to" (citations omitted)).

¶125 Moreover, we have recognized that, where a task or power may be properly exercised by more than one branch, the Legislature may, in some circumstances, direct the assignment of those tasks. *See Taylor v. Lee*, 226 P.2d 531, 536–38 (Utah 1951) (concluding that "the Legislature could grant to the Governor the right to remove for cause even though it might involve the exercise of some power usually considered judicial"); *Citizens' Club v. Welling*, 27 P.2d 23, 25 (Utah 1933) (accepting the argument that "while the courts have undoubted power to revoke and annul charters granted to corporations on grounds, among others, of an illegal or wrongful exercise or use of such charters, yet it also is competent for the Legislature to provide for a legislative or administrative forfeiture of the charter as well as for a judicial one").

¶126 Therefore, if we wanted to answer the question of whether separation of powers principles prevent this court from hearing the claim of a "registered voter" that an election violates one or more statutory grounds—where the statute expressly allows any "registered voter" to bring such a claim—we would need to put that question through *In Re Young* framework. *See supra* ¶ 35 (quoting UTAH CODE § 20A-4-403(1)(a)). We would first ask whether hearing a complaint brought by a person the Legislature authorized to file suit would cause the judiciary to exercise a power properly belonging to another branch of government. *See In re Young*, 1999 UT 6, ¶ 14. We would then ask whether the exercise of that power requires us to perform a function that appertains to or is exclusive to one of the other branches. *See id.* And, were we to find that such function is exclusively performed by the legislative branch, we would ask whether the Utah Constitution expressly allows the judicial branch to also exercise that function. *See id.* ¶ 8.

¶127 While I do not advocate resolving this question without the benefit of briefing, I currently find it difficult to imagine a successful argument that the legislative branch alone can examine whether a municipality has complied with the elections code in the absence of a plaintiff with a particularized injury. And I cannot presently see how we could reach the conclusion that we somehow perform a function that belongs to the legislative branch if we were to respect a statute

PEARCE, J., *concurring in part and concurring in the judgment*

that authorizes a citizen without a particularized injury to bring that challenge.[69]

## CONCLUSION

¶128 To be certain, I am not offering a definitive opinion on the question of our constitution's requirements on standing. We have not had sufficient briefing on these questions and, therefore, they should remain to be answered in another matter. I simply register my concerns about statements we have made about the constitutional underpinnings of a traditional standing requirement under the Utah Constitution and how they might relate to the Legislature's ability to grant standing.

---

[69] Associate Chief Justice Lee raises an additional idea. He argues that historical understandings of "judicial power" are narrow and conflict with Utah's doctrine of public interest standing, as well as with the Legislature's ability to statutorily grant standing to a broader range of plaintiffs than would a traditional standing doctrine. *See supra* ¶¶ 70–71. In *In Re Gestational Agreement*, I highlighted my concerns with the cases that have purported to offer conclusive statements on what the Utah Constitution talks about when it talks about judicial power. *See* 2019 UT 40, ¶¶ 88–94, 449 P.3d 69 (Pearce, J., concurring). I will not rehearse here what I said there. But I will emphasize one point from my concurrence that this case has reaffirmed: I continue to believe that "there is work to be done before we can be so definitive about the meaning of our constitution." *Id.* ¶ 93.