**2024 UT App 126**

## THE UTAH COURT OF APPEALS

ERDA COMMUNITY ASSOCIATION INC., RYAN SORENSEN, KALEM
SESSIONS, AND DENISE MOODY-MARTIN,
Appellants,
*v.*
GRANTSVILLE CITY,
Appellee.

Opinion
No. 20220760-CA
Filed September 12, 2024

Third District Court, Tooele Department
The Honorable Teresa Welch
No. 200301207

Janet M. Conway, Attorney for Appellants

Robert C. Keller, Dani N. Cepernich,
Nathanael J. Mitchell, and Brett M. Coombs,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN D. TENNEY
concurred.

HARRIS, Judge:

¶1     At issue in this case is whether Grantsville City (Grantsville) lawfully annexed 550 acres of land (the Property) into its boundaries in August 2020. Both Grantsville and the owner of the Property were in favor of the annexation. But the Property was located, at the time, inside the boundaries of a proposed new city: Erda. Vehemently opposed to the annexation stood certain members of the community who supported Erda's ongoing and then-incomplete incorporation process, including appellants Ryan Sorensen, Kalem Sessions, and Denise Moody-Martin (collectively, Sponsors)—three of the sponsors of the Erda

incorporation petition—and including other community members who had formed appellant Erda Community Association Inc. (the Association).

¶2    Just a few weeks after Grantsville finalized the annexation, Sponsors and the Association (collectively, Appellants) filed a petition in district court challenging it. Eventually, however, the court dismissed the petition on summary judgment, concluding (among other things) that Appellants lacked statutory standing to challenge Grantsville's annexation of the Property. Appellants contest that dismissal order and point out that they brought both statutory and constitutional challenges to Grantsville's annexation. We agree with the district court, and with Grantsville, on the question of whether Appellants have statutory standing to bring statutory challenges to the annexation: they do not. But the district court did not assess whether Appellants have traditional standing to bring constitutional challenges to the annexation, and we therefore remand the case to the district court for that assessment to occur in the first instance.

## BACKGROUND[1]

### *Incorporation of the New City of Erda*

¶3    Appellants describe Erda as "a rural, agriculture-based area" situated in Tooele County between the cities of Grantsville and Tooele. In 2018, Erda was a town located within unincorporated Tooele County, *see Tooele County v. Erda Cmty. Ass'n*, 2022 UT App 123, ¶ 1 n.1, 521 P.3d 872, and some of its residents were "concerned about their area being developed into a higher density residential area" and wanted more flexibility to

---

1. "When reviewing a grant of summary judgment, we view the facts in a light most favorable to the losing party below," and we recite the facts accordingly. *Turley v. Childs*, 2022 UT App 85, n.1, 515 P.3d 942 (quotation simplified).

be able "to protect open space and their rural, agricultural community." To this end, Sponsors initiated the process of incorporating a new city, known as Erda, and in October 2018 they asked the lieutenant governor's office to conduct a study aimed at ascertaining whether incorporation of the new city would be feasible. *See generally* Utah Code §§ 10-2a-101 to -510 (2018) (the Incorporation Code).[2] With the request, Sponsors submitted proposed municipal boundaries for the new city, and the study—which was conducted over the next year or so—used the proposed boundaries as parameters for measuring feasibility.

¶4 The feasibility study was completed in February 2020, and it concluded that incorporation of the new city was "feasible and would not place an additional tax burden on property owners in the proposed incorporation area." Thereafter, two public hearings were held, one on March 23 and the other on March 30, where the results of the study were presented to members of the public. After that, Sponsors set about gathering the requisite number of signatures from property owners inside the proposed incorporation area. *See id.* § 10-2a-202(2)(a). Finally, on June 2, 2020, after they had gathered enough signatures, Sponsors officially submitted to the lieutenant governor a petition (Incorporation Petition) "to place Erda's incorporation measure on the ballot." Shortly thereafter, the lieutenant governor's office certified the Incorporation Petition as valid and complete, and it placed the matter on the ballot for the November 2020 general election. In that election, the voters inside the proposed

---

2. The Incorporation Code indicates that if a "feasibility request for incorporation of a city" was filed before May 14, 2019, then the "process for incorporating the city" is subject to the law that was in effect on the day the feasibility request was filed. Utah Code § 10-2a-106(1) (2023). Unless otherwise indicated, we therefore refer to the 2018 version of the Incorporation Code, which was in effect when Sponsors filed their feasibility request.

incorporation area voted in favor of incorporation, and Erda officially became a city in January 2022.

*Grantsville's Annexation of the Property*

¶5 While most landowners inside the proposed incorporation area were—as shown by the results of the election—in favor of forming a new city, one particular corporate landowner (Landowner) was not. In the spring of 2020, right after the feasibility study was completed, Landowner—who owned the Property—began to take steps to have the Property annexed into neighboring Grantsville and thereby excluded from the boundaries of the proposed new city of Erda. The Property is rectangular in shape, and it is located mostly well inside the boundaries of the proposed city of Erda, as those boundaries were depicted in the feasibility study. However, for a short distance, the southwest corner of the Property touches Grantsville's eastern boundary.[3] In March 2020, Landowner submitted a petition (Annexation Petition) to Grantsville asking it to annex the Property into Grantsville. *See generally id.* §§ 10-2-401 to -429 (2020) (the Annexation Code).[4]

---

3. It is unclear from the record exactly how much of the Property, pre-annexation, shared a boundary with Grantsville. But during oral argument before this court, counsel for Appellants represented that the Property was contiguous with Grantsville for only about one hundred feet and characterized the Property as "basically an island" inside Erda's boundaries.

4. Absent one of the narrow exceptions enumerated by our supreme court, such as a statutory provision that "is expressly declared to be retroactive," "courts must apply the law in effect at the time of the occurrence regulated by that law." *State v. Clark*, 2011 UT 23, ¶ 11, 251 P.3d 829 (quotation simplified). Because the

(continued…)

¶6 After learning of the Annexation Petition, Sponsors (through counsel) contacted Grantsville and urged Grantsville to reject the Annexation Petition on the grounds that it did not contain certain items and information required by the Annexation Code. For instance, and among other asserted deficiencies, Sponsors pointed out that the Annexation Petition did not contain "an accurate and recordable map, prepared by a licensed surveyor, of the area proposed for annexation." *See id.* § 10-2-403(3)(c). After hearing from Sponsors, Grantsville informed Landowner that its Annexation Petition was indeed incomplete and that it must submit additional information—including a final plat map—required by the Annexation Code before its petition could move forward. Landowner submitted an updated Annexation Petition, including the previously missing map, on May 28, 2020, five days before Sponsors submitted their Incorporation Petition to the lieutenant governor's office.

¶7 Grantsville then certified the Annexation Petition and scheduled a public hearing of its city council, to be held on August 5, at which the Annexation Petition could be discussed. *See id.* § 10-2-418(5)–(6). On July 31, a member of the Association submitted a written protest of the Annexation Petition, but this protest misidentified the proposed annexed area. And on August 5, at some point prior to the hearing, Sponsors submitted a letter to Grantsville opposing the annexation, outlining what they believed to be legal grounds to deny the Annexation Petition and asserting that Grantsville's annexation of the Property would have a deleterious effect on their pending Incorporation Petition.

¶8 On August 5, the public hearing went forward as scheduled. At the hearing, Grantsville's mayor read aloud the Association member's protest as well as the letter Grantsville had received from Sponsors. The mayor then "asked if there were any

---

Annexation Petition was filed in early 2020, we apply and refer to the 2020 version of the Annexation Code throughout this opinion.

other comments" relevant to the Annexation Petition, and when none were offered, he "closed the public hearing." Later, during the private portion of the hearing, the Grantsville City Council voted to approve the annexation and to adopt "Ordinance 2020-23," thereby annexing the Property into Grantsville.

*The Litigation*

¶9     On September 2, 2020, Appellants initiated this action by filing, in the district court, a "Petition for Judicial Review of Land Use Decision and Declaratory Relief." In their petition, Appellants named Grantsville as respondent,[5] and they set forth two "counts." In their first count, they sought "judicial review" of a "land-use decision" that they considered "illegal," invoking Utah's Municipal Land Use, Development, and Management Act (MLUDMA). *See id.* §§ 10-9a-101 to -1005. This claim is entirely statutory: in essence, Appellants assert that Grantsville's annexation of the Property violated various provisions of the Annexation Code. In their second count, Appellants made constitutional claims, asserting that Grantsville's annexation of the Property had violated their due process rights under both the United States Constitution and the Utah Constitution. In their prayer for relief, Appellants asked for a declaration—having earlier invoked Utah's Declaratory Judgment Act, *see id.* §§ 78B-6-401 to -412—that the annexation was "without authority, contrary to law, in violation of [Appellants'] constitutional rights, and void." They also asked for "[e]xtraordinary relief in the form of an order requiring" Grantsville to repeal the annexation ordinance, and for attorney fees.

---

5. Appellants also named as respondents several individual government officials. The district court eventually dismissed the individual respondents—leaving Grantsville as the sole respondent—and Appellants have not challenged that ruling.

¶10 In the months following the filing of the petition, the district court denied both Appellants' motion for a preliminary injunction and Grantsville's motion to dismiss, and the case moved through the discovery phase. After completion of discovery, Grantsville and Sponsors filed dueling motions for summary judgment.[6]

¶11 In its motion, Grantsville requested that the petition be dismissed in its entirety. In particular, Grantsville argued that Appellants lacked standing to assert their MLUDMA claim because "they are not within the zone of interests protected by the relevant statutes" and because "they failed to exhaust their administrative remedies." What's more, Grantsville reasserted its position that even if Appellants could establish that they had statutory standing to bring their claim, their challenges would "fail on the merits" because Grantsville "complied with the relevant statutory requirements" set forth in the Annexation Code. As for Appellants' due process claim, Grantsville argued that it was entitled to summary judgment in its favor because Appellants "cannot show the existence or deprivation of a constitutionally protected liberty or property interest."

¶12 In their competing motion, Sponsors asserted that while their "initiative measure to incorporate Erda was pending on the ballot, Grantsville certified an invalid, untimely, and legally deficient annexation application," and they asked the court to declare the annexation "void ab initio" and to order Grantsville to repeal the annexation ordinance. In response to Grantsville's motion, Appellants argued that they had standing to bring their claims because the annexation had harmed their incorporation efforts. And they asserted that "[t]he doctrine of administrative exhaustion does not apply" to bar their petition, and even if it did,

---

6. The petitioner-side motion was filed only by Sponsors; the Association—although it is included as a petitioner in Appellants' petition—was specifically excluded as a movant.

"unusual circumstances [exist] that necessitate application of established exceptions to that doctrine." In response to the assertion that they had no protectable interest in the annexation process, Appellants invoked their constitutional claim and argued that the annexation had deprived them of due process. But due process was not the only constitutional interest Appellants referenced in their response to Grantsville's motion. For the first time in the litigation, Appellants invoked two other provisions of the Utah Constitution: the citizen initiative right guaranteed by Article VI, Section 1, and the open courts provision contained in Article I, Section 11.[7] Specifically, they asserted that Sponsors had an interest in having the citizens of Erda vote on the Incorporation Petition—for which they had gathered signatures to secure its place on the general election ballot—using the proposed city boundaries that had been presumed during the feasibility study. And they asserted that if they were not allowed the "right to bring legal action to challenge Grantsville's illegal actions," then their rights to openly access the courts would be violated.

¶13 After full briefing and oral argument, the district court took the matter under advisement, and a few weeks later it issued a written ruling. The district court first concluded that Appellants lacked statutory standing under the Annexation Code and therefore could not bring a statutory challenge to Grantsville's annexation of the Property. The court noted that "the plain language" of the Annexation Code indicated that a protest to an annexation petition "may only be filed by" certain categories of individuals and entities, including a "legislative body or governing board of an affected entity" and an "owner" of certain "rural real property." *See id.* § 10-2-407(1). The court then concluded that Appellants did not fall within any of the

_____

7. During oral argument before this court, Appellants acknowledged that the due process clauses (of both the federal and state constitutions) were the only constitutional provisions they mentioned in their petition.

applicable categories, and that they could not "circumvent the plain language" of the Annexation Code "by relying on other unrelated" constitutional and statutory provisions. The court completed this section of its analysis by stating that, "[f]or this reason alone," Grantsville's motion to dismiss the petition should be granted. However, the court did not assess whether Appellants might have standing, under the separate traditional standing test, to bring independent constitutional claims.

¶14 Alternatively, the district court concluded that Appellants had failed to exhaust administrative remedies, because none of them had filed "a timely protest of" the Annexation Petition. And it concluded that none of the exceptions to the exhaustion requirement were applicable here, and that exhaustion constituted an independent alternative basis for granting Grantsville's motion.

¶15 Finally, even though it noted "that it need not reach the merits" of this matter, the court nevertheless indicated that it was "persuaded by [Grantsville's] argument that the plain language" of the Annexation Code, specifically section 10-2-403, "created a statutory window"—after a feasibility study had been completed but before a final incorporation petition was filed with the lieutenant governor's office—within which an annexation petition could lawfully be filed, notwithstanding the presence of ongoing incorporation efforts.

¶16 On this basis, the district court denied Sponsors' motion for summary judgment and granted Grantsville's, and it later entered judgment in Grantsville's favor.

ISSUES AND STANDARDS OF REVIEW

¶17 Appellants now appeal, and they challenge the district court's entry of summary judgment in favor of Grantsville. In general, "we review the district court's summary judgment ruling

for correctness and view all facts and reasonable inferences in favor of the nonmoving party." *See GeoMetWatch Corp. v. Utah State Univ.*, 2023 UT App 124, ¶ 18, 538 P.3d 933 (quotation simplified). But when the decision has to do with standing, governing case law is a bit murkier: we are to review the district court's "legal determinations relevant to" standing "for correctness," *see Summit County v. Town of Hideout*, 2024 UT 16, ¶ 28, and we "defer to the district court's factual determinations," if any (although in the summary judgment context there shouldn't be), *see Planned Parenthood Ass'n of Utah v. State*, 2024 UT 28, ¶ 42. The ultimate question of whether standing is present—even in procedural contexts where no evidentiary hearing was held—is "a mixed question of fact and law" because that question involves "the application of a legal standard to a particularized set of facts," and on that question our supreme court has instructed us to "give minimal discretion to" a court's final determination "of whether a given set of facts fits the legal requirements for standing." *Id.* (quotation simplified) (reviewing a standing determination made in the context of a preliminary injunction); *see also Alpine Homes, Inc. v. City of West Jordan*, 2017 UT 45, ¶¶ 10–11, 424 P.3d 95 (reciting the "minimal discretion" standard, even in the context of reviewing a decision made on a motion to dismiss). In the end, though, because this particular mixed question is thought to be "primarily a question of law," we follow our supreme court's lead in reviewing "the district court's determination for correctness." *See Salt Lake City Corp. v. Jordan River Restoration Network*, 2018 UT 62, ¶ 19, 435 P.3d 179 (quotation simplified); *see also McKitrick v. Gibson*, 2021 UT 48, ¶ 14, 496 P.3d 147 (stating that "the question of whether a specific individual has standing to assert a claim is primarily a question of law").

## ANALYSIS

¶18 Appellants brought both statutory-based and constitutional-based claims for relief, and the district court

dismissed all of those claims for lack of standing. Appellants appeal that ruling, and we begin our analysis with a general discussion of standing, as it applies to both statutory and constitutional claims. Thereafter, we address the merits of Appellants' arguments, discussing the statutory claims first and then the constitutional claims.

## I. Standing

¶19    The term "standing" is "a word of many, too many, meanings." *See Environmental Barrier Co. v. Slurry Sys., Inc.*, 540 F.3d 598, 605 (7th Cir. 2008) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998)); *see also Flast v. Cohen*, 392 U.S. 83, 99 (1968) ("Standing has been called one of the m[o]st amorphous concepts in the entire domain of public law." (quotation simplified)). "Everything from the fundamental requirement imposed by Article III [of the United States Constitution] that there must be a 'case or controversy' between the parties seeking relief in federal court, to various prudential doctrines such as the restrictions on invoking the rights of third parties, to the inquiry whether a statute is designed to protect the rights of the person before the court, has been swept into the word 'standing.'" *Environmental Barrier*, 540 F.3d at 605. Because it is a word that can carry different meanings, bench and bar should take care to use the term "standing" carefully and with precision.

¶20    In particular, one must take care to differentiate between the sort of "standing" that carries jurisdictional implications and the sort of "standing" that does not. As applicable here, there exist material differences between "constitutional standing" and "statutory standing."

### A. Constitutional Standing

¶21    Although the Utah Constitution—unlike the federal constitution—does not contain a "case or controversy" requirement and therefore "includes no express limitation" on

Utah courts' jurisdiction, our supreme court has stated that the Utah Constitution "nevertheless mandates certain standing requirements, which emanate from the principle of separation of powers." *See Laws v. Grayeyes*, 2021 UT 59, ¶ 33, 498 P.3d 410 (quotation simplified); *see also Jenkins v. Swan*, 675 P.2d 1145, 1149–50 (Utah 1983). And "to ensure this separation," our constitution "require[s] a plaintiff to demonstrate a personal stake in the outcome of a dispute," a requirement that "limits the jurisdiction of the courts to those disputes which are most efficiently and effectively resolved through the judicial process." *Laws*, 2021 UT 59, ¶ 34 (quotation simplified).

¶22 Because this type of standing implicates Utah courts' "judicial power" to hear cases—a power stemming from Article VIII of the Utah Constitution—it carries jurisdictional implications. *See Osguthorpe v. Wolf Mountain Resorts, LC*, 2010 UT 29, ¶ 14, 232 P.3d 999 (stating that, "in Utah, standing is a jurisdictional requirement" because "a challenge to a party's standing raises fundamental questions regarding a court's basic authority over the dispute" (quotation simplified)); *see also Gregory v. Shurtleff*, 2013 UT 18, ¶ 69, 299 P.3d 1098 (Lee, J., concurring) (stating that "standing, like mootness, places well-defined, principled limitations on the scope of Article VIII's grant of judicial power"); *Zion Village Resort LLC v. Pro Curb U.S.A. LLC*, 2020 UT App 167, ¶ 53, 480 P.3d 1055 ("The type of 'standing' that implicates subject-matter jurisdiction is standing of the constitutional variety . . . ." (quotation simplified)). If this sort of "constitutional standing"—also often referred to as "traditional standing"—is not present, then Utah courts lack the judicial power to adjudicate the case. Thus, *all* claimants—regardless of the nature of their specific claims—must demonstrate that they have constitutional standing to bring their claims.

¶23 Despite the fact that the Utah Constitution does not contain the same "case or controversy" requirement found in the federal constitution, our "'traditional standing' requirements mimic

those imposed by the United States Supreme Court's interpretation of the federal constitution." *Planned Parenthood Ass'n of Utah v. State*, 2024 UT 28, ¶ 47 n.5; *accord Carlton v. Brown*, 2014 UT 6, ¶ 23, 323 P.3d 571. As articulated by our supreme court, the test for constitutional standing "is often referred to as the distinct and palpable injury requirement." *See Utah Chapter of the Sierra Club v. Utah Air Quality Board*, 2006 UT 74, ¶ 19, 148 P.3d 960 (quotation simplified). This test involves a "three-step inquiry": (1) "the party must assert that it has been or will be adversely affected by the challenged actions"; (2) "the party must allege a causal relationship between the injury to the party, the challenged actions and the relief requested"; and (3) "the relief requested must be substantially likely to redress the injury claimed." *Id.* (quotation simplified). Simply put, traditional standing requires a claimant to show injury, causation, and redressability.

¶24 "Under the first prong of the traditional test, the petitioning party must allege that it has suffered or will suffer some distinct and palpable injury that gives it a personal stake in the outcome of the legal dispute." *City of Grantsville v. Redevelopment Agency of Tooele City*, 2010 UT 38, ¶ 14, 233 P.3d 461 (quotation simplified). As for the second and third prongs, "[t]here must also be some causal relationship alleged between the injury to the plaintiff, the [challenged] actions and the relief requested." *Jenkins*, 675 P.2d at 1150. And "[b]ecause standing questions are usually raised prior to the introduction of any evidence," courts are often left having to make a judgment as to the likelihood that the plaintiff will be able to establish both a causal relationship and that "the relief requested is substantially likely to redress the injury claimed." *Id.*

### B. Statutory Standing

¶25 "Statutory standing" is a concept distinct from "traditional standing," and which arises only when the claim in question is

statutory in nature—that is, the claim seeks relief under a statute or asserts that statutory requirements have been violated.

¶26 In that situation, claimants must demonstrate *both* statutory standing *and* traditional standing. *See Bleazard v. City of Erda*, 2024 UT 17, ¶ 43, 552 P.3d 183 (stating that, in an "action to enforce a statute, statutory standing is an initial 'hurdle' that a plaintiff must clear before a court proceeds to examine whether the plaintiff has shown traditional standing"); *McKitrick v. Gibson*, 2021 UT 48, ¶ 48, 496 P.3d 147 (stating that "statutory standing is mandatory for statutory claims," and that "traditional or alternative standing cannot excuse a lack of statutory standing where the petitioner is a statutory claimant").

¶27 When our legislature enacts a statute, it is entitled—within constitutional bounds—to enact "statutory requirements," and "it is entitled to designate, as it sees fit, how those requirements are to be enforced." *Bleazard*, 2024 UT 17, ¶ 42 (quotation simplified). In some situations, our legislature has limited the categories of individuals or entities who are authorized to seek redress under a statute. And in those situations, a claimant "has [statutory] standing only if he [or she] is within the class of parties that the legislature authorized to file suit." *Haik v. Jones*, 2018 UT 39, ¶ 39, 427 P.3d 1155 (Lee, J., concurring); *accord McKitrick*, 2021 UT 48, ¶ 48; *cf. Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (stating that whether a party has the requisite standing to assert "a statutory cause of action" is dependent on whether the interests of that petitioner "fall within the zone of interests protected by the law invoked" (quotation simplified)).

¶28 When the claim at issue is statutory, our supreme court has instructed courts to begin the standing analysis with statutory standing, and then move to an examination of traditional standing only if statutory standing is present. *See McKitrick*, 2021 UT 48, ¶ 48 ("If a plaintiff is asserting a statutory claim, the constitutional standing question arises if and only if the plaintiff

has statutory standing." (quotation simplified)); *see also Haik*, 2018 UT 39, ¶ 41 (Lee, J., concurring) ("Constitutional standing is a backstop, in other words—a set of secondary requirements that are relevant only if the plaintiff can first show that the legislature has authorized him [or her] to file suit . . . .").

¶29  Although our supreme court has not been entirely precise on this point,[8] our understanding is that the statutory standing inquiry—unlike the traditional/constitutional standing inquiry—is not jurisdictional, because it does not implicate the constitutional power of the judiciary but, rather, consists merely of examining whether a plaintiff has met statutory prerequisites. *See In re adoption of B.B.*, 2017 UT 59, ¶ 124, 417 P.3d 1 (stating that any "deficiency in this or any other [statutory] prerequisite falls outside the traditional scope of subject-matter jurisdiction"); *Tooele Meat & Storage Co. v. Fite Candy Co.*, 168 P. 427, 428 (Utah 1917) (stating that "[t]he objection that the plaintiff has not legal capacity to sue, or to maintain or prosecute an action" is "like one that the plaintiff is not the real party in interest," and does not implicate subject-matter jurisdiction but, rather, is an objection

---

8. For instance, our supreme court has recently stated that a claim of a party who lacks statutory standing "is not justiciable." *See Bleazard v. City of Erda*, 2024 UT 17, ¶ 37, 552 P.3d 183; *see also Estate of Faucheaux v. City of Provo*, 2019 UT 41, ¶¶ 24–25, 449 P.3d 112 (leaving open the question of whether "a plaintiff's lack of capacity to sue is an affirmative defense subject to forfeiture," or whether it "raise[d] a jurisdictional question that would not be subject to waiver"). But the court has not explained why statutory standing—as opposed to constitutional standing—would raise justiciability concerns; accordingly, and until instructed otherwise, we consider the court's use of the term "not justiciable" in this context to have simply been a way of stating that a statutory claim cannot go forward in the absence of statutory standing, and not necessarily indicating that statutory standing raises any *constitutional* justiciability concerns.

"that, under all of the codes, must be taken at the proper time and in the proper manner or it will be deemed waived"); *see also Lexmark*, 572 U.S. at 128 n.4 (opining that the absence of "statutory standing . . . does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional power to adjudicate the case" (quotation simplified)); *Norris v. Causey*, 869 F.3d 360, 366 (5th Cir. 2017) (holding that a question whether a plaintiff is the proper party to bring suit is one of "contractual or statutory standing and does not go to a court's subject matter jurisdiction").

¶30     At root, questions surrounding statutory standing are questions of statutory interpretation. *See Bleazard*, 2024 UT 17, ¶ 46 ("Whether a party has a statutory private right of action is a question of statutory interpretation." (quotation simplified)); *see also McKitrick*, 2021 UT 48, ¶¶ 33–43 (interpreting the language of the relevant statute and generally discussing whether it allowed the petitioner to seek redress). If the statute that the claimant invokes expressly allows that claimant—as opposed to just the State or other categories of individuals—to seek redress, then the claimant has statutory standing. *See Bleazard*, 2024 UT 17, ¶ 43 (stating that statutory standing exists if the claimant is "within the class of parties that the legislature authorized to file suit for such a statutory violation").

¶31     If the statute that the claimant invokes does not expressly allow that claimant to seek redress, then the claimant must show that there exists a "clearly implied" right of redress in the statutory language. *See Conner v. Department of Com.*, 2019 UT App 91, ¶ 27, 443 P.3d 1250 ("The creation of such a right must be either express or clearly implied from the text of the statute." (quotation simplified)). But Utah courts are reluctant to recognize such implied rights. Indeed, our supreme court recently had this to say on the subject:

> In the absence of language expressly granting a private right of action in the statute itself, the courts

of this state are reluctant to imply a private right of action based on state law. Our reluctance is amplified when, for example, discerning a right of action would require us to infer language and meaning that does not appear on the face of the statute or when doing so would be inconsistent with the Legislature's statutory scheme. As a result, we are not generally in the habit of implying a private right of action. In fact, Utah courts have rarely, if ever, found a Utah statute to grant an implied private right of action.

*Bleazard*, 2024 UT 17, ¶ 47 (quotation simplified); *see also Touchard v. La-Z-Boy Inc.*, 2006 UT 71, ¶ 21, 148 P.3d 945 ("Utah courts are reluctant to imply a private statutory cause of action in the absence of express statutory language."). And our supreme court has recently declined invitations to recognize implied rights of action from "oblique" statutory references, *see Bleazard*, 2024 UT 17, ¶ 55, or from a "statute's broad statements of purpose," *see Summit County v. Town of Hideout*, 2024 UT 16, ¶ 43. Thus, generally speaking, if a claimant does not fall within the class of persons identified in the statute as authorized to seek redress, that claimant will lack statutory standing and will not be allowed to maintain any claims arising under that statute. *See Bleazard*, 2024 UT 17, ¶ 56; *Summit County*, 2024 UT 16, ¶ 43; *see also Jensen v. IHC Hosps., Inc.*, 944 P.2d 327, 335 (Utah 1997) (stating that the decedent's children could not bring a wrongful death claim because the decedent had a guardian at the time of her death and the relevant statute at the time only allowed such an action to be brought by a personal representative or guardian of the decedent); *State Farm Mutual Auto. Ins. Co. v. Clyde*, 920 P.2d 1183, 1185–87 (Utah 1996) (concluding that the grandparents of an unborn child were not within the class of individuals entitled to bring a wrongful death claim where the legislature indicated such claims could only be brought by a "parent" or "guardian").

C. The Interplay Between Constitutional and Statutory Standing

¶32　Finally, we briefly discuss some aspects of the interplay between constitutional and statutory standing. First, as noted, statutory standing is a concept that applies only to claims that seek redress under a statute; it does not apply to other types of claims, including common-law claims and constitutional claims, and claimants who bring these other types of claims do not need to demonstrate statutory standing. *See Haik*, 2018 UT 39, ¶ 39 (Lee, J., concurring) (stating that statutory standing is required only "[i]f the plaintiff is asserting a statutory claim"); *see also Bleazard*, 2024 UT 17, ¶ 41 (engaging in only a statutory standing analysis because the claimants did not make any common-law or constitutional claims); *Summit County*, 2024 UT 16, ¶ 34 (same).

¶33　Second, and relatedly, the traditional standing test—and not the statutory standing test—is applicable where a party raises a challenge to the constitutionality of a state statute. *See Planned Parenthood Ass'n of Utah*, 2024 UT 28, ¶ 52 (applying traditional standing to the plaintiff's challenge to a Utah statute that threatened criminal prosecution and licensing penalties to physicians providing certain types of abortion care); *see also State v. Roberts*, 2015 UT 24, ¶¶ 44–52, 345 P.3d 1226 (examining a party's standing to challenge the constitutionality of a criminal statute under the traditional standing test); *Carlton v. Brown*, 2014 UT 6, ¶¶ 24–25, 323 P.3d 571 (concluding that a father with traditional standing could challenge the constitutionality of the Utah Adoption Act even though he "lacked [statutory] standing . . . because he did not have any rights to the child in the first place"). Indeed, our supreme court rejected as "circular[]" the argument that a claimant who lacks statutory standing is thereby barred from challenging the relevant statute on constitutional grounds, and stated:

> If a plaintiff wishes to challenge the constitutionality of a statute and has adequately shown harm,

causation, and redressability, the allegedly unconstitutional statute cannot then be used as grounds for denying that plaintiff standing. For if it could be so utilized, it would be impossible to raise a constitutional challenge to any statute, no matter how unconstitutional, provided that the statute itself denied standing to putative plaintiffs who wish to challenge it.

*Carlton*, 2014 UT 6, ¶ 25.

## II. Appellants' Specific Challenges

¶34 With these principles in mind, we turn to the merits of Appellants' specific challenges to the district court's order dismissing both their statutory claims and their constitutional claims for lack of standing. We agree with Grantsville that the court correctly dismissed Appellants' statutory claims for lack of statutory standing. But we reach a different conclusion with regard to the court's dismissal of Appellants' constitutional claims, because it is not apparent from this record that Appellants lack traditional standing to challenge the constitutionality of the Annexation Code.

### A. Statutory Claims

¶35 As noted already, Appellants' main grievance is statutory: they assert that Grantsville violated certain provisions of the Annexation Code during its annexation of the Property. They seek redress for these asserted statutory violations in two respects. First, they ask for a judicial order—a declaratory judgment—stating that Grantsville's annexation of the Property was in violation of the Annexation Code and was therefore "without authority, contrary to law, . . . and void." Second, they seek judicial review of Grantsville's annexation ordinance pursuant to MLUDMA, which allows an "adversely affected party" to seek judicial review of "a land use decision." *See* Utah Code § 10-9a-

801(1), (2)(a). These claims for redress are entirely statutory, and therefore Appellants must demonstrate statutory standing in order to bring them. But they have not made that showing.

1.      The Annexation Code and the Declaratory Judgment Act

¶36    Our legislature has "the authority to determine municipal boundaries," a subject that includes the ability to regulate land annexation, "which is the extension of town or city boundaries into unincorporated areas." *Summit County v. Town of Hideout*, 2024 UT 16, ¶ 6. To this end, our legislature has enacted the Annexation Code, pursuant to which it has "delegated" certain annexation powers "to local governments," *see id.*, and has set forth the particulars of when and how cities may annex land into their municipal boundaries, *see* Utah Code §§ 10-2-401 to -429. And in so doing, our legislature has put restrictions in place regarding how a city's annexation decisions can be challenged, including restrictions on who is entitled to raise such challenges. *See id.* § 10-2-407(1); *see also Bleazard v. City of Erda*, 2024 UT 17, ¶ 42, 552 P.3d 183 ("Where the legislature creates statutory requirements, it is entitled to designate, as it sees fit, how those requirements are to be enforced." (quotation simplified)).

¶37    Under the plain language of the version of the Annexation Code in effect in 2020, a "protest to an annexation petition . . . may be filed by" anyone who fits within one of three categories: (1) "the legislative body or governing board of an affected entity"; (2) "the owner of" certain "rural real property" as defined in a different statute; or (3) for annexations "within a county of the first class," "the owners of private real property" that meets certain conditions. Utah Code § 10-2-407(1). The district court determined that Appellants do not fit within any of these categories. And Appellants do not challenge that determination here on appeal; that is, they do not contest the court's ruling that they do not "fall within the class of parties that the legislature authorized to file suit to enforce the statutory scheme," *see*

*Bleazard*, 2024 UT 17, ¶ 37 (quotation simplified), and that they therefore have no statutory right to file a protest of Grantsville's annexation of the Property. Thus, Appellants acknowledge that they lack statutory standing to seek redress pursuant to the Annexation Code.

¶38 Instead, Appellants turn to the Declaratory Judgment Act, and contend that they don't need to "rely upon obtaining statutory standing" from the Annexation Code because, in their view, the Declaratory Judgment Act affords them the necessary statutory standing. But this argument is directly foreclosed by our supreme court's recent holdings in *Bleazard* and *Summit County*.[9] In those cases, the court held that "parties may bring actions under the Declaratory Judgment Act only if they can show that the justiciable and jurisdictional elements requisite in ordinary actions—including standing—are present." *Summit County*, 2024 UT 16, ¶ 33 (quotation simplified); *see also Bleazard*, 2024 UT 17, ¶ 39 ("To bring a declaratory judgment action, a plaintiff must show that the justiciable and jurisdictional elements requisite in ordinary actions are present." (quotation simplified)). The court pointed out that one of the requirements that must be satisfied in order to succeed on a Declaratory Judgment Act claim is that the party "seeking relief must have a legally protectible interest in the controversy," something that—for a statutory claim—exists only when the claimant has "an express or implied statutory right of action." *Summit County*, 2024 UT 16, ¶¶ 33, 35. And the court made clear that a party who complains that a statute has been violated, but who is not within the class of persons authorized to seek relief under that statute, cannot use the Declaratory Judgment Act to circumvent its lack of statutory standing.

---

9. After our supreme court issued these two opinions, we invited the parties "to address the applicability of these cases in simultaneously-filed supplemental briefs." Both parties took the opportunity to submit such briefing; we appreciate the parties' input and have considered their submissions.

Instead, the court held that "[p]laintiffs who seek a declaration that statutorily created requirements have been violated—and who do not invoke legal rights protected elsewhere, such as in the common law or the constitution—must show that they have so-called 'statutory standing.'" *Bleazard*, 2024 UT 17, ¶ 37; *accord Summit County*, 2024 UT 16, ¶ 35.

¶39 Appellants here do not contest the district court's determination that they do not fit within any of the categories of individuals authorized under the Annexation Code to file a protest to a municipal annexation. Because of this, Appellants not only lack statutory standing under the Annexation Code, but they also lack any "legally protectible interest" that would allow them to seek a declaratory judgment regarding any alleged violation of the Annexation Code. Accordingly, Appellants lack standing to seek redress for such statutory violations, regardless of whether they ground their complaints in the Annexation Code or the Declaratory Judgment Act.

2.      MLUDMA

¶40 Alternatively, Appellants invoke MLUDMA and assert a statutory right, as an "adversely affected party," to seek judicial review of Grantsville's "land use decision" to annex the Property. *See* Utah Code § 10-9a-801(1), (2)(a).[10] But in order to meaningfully analyze whether Appellants have standing to bring this claim, we must identify Appellants' underlying complaint about what it is they think was wrong with Grantsville's annexation of the Property. After all, the MLUDMA provision they invoke—section 10-9a-801—simply sets forth a *procedural* mechanism for obtaining

---

10. For purposes of this section of our opinion, we assume (without deciding) that Appellants qualify as parties that were "adversely affected" by Grantsville's annexation of the Property, and that Grantsville's decision to annex the Property was a "land use decision" within the meaning of section 10-9a-801(2)(a).

review of a land use decision; it does not set forth any substantive standards about the propriety of such decisions. *See id.* § 10-9a-801. The substantive standards by which a district court would, on review, assess the legality of the challenged land use decision must come from somewhere else in the law. And as we understand their claim, Appellants assert, in their MLUDMA claim, that judicial relief would be appropriate because Grantsville's annexation of the Property violated certain provisions of the Annexation Code.

¶41   Assuming that we are correctly interpreting Appellants' MLUDMA claim, it fails for the same reason (discussed above) that their Declaratory Judgment Act claim fails: for lack of statutory standing to complain about violations of the Annexation Code. Regardless of whether their entrée to the district court comes by way of the Declaratory Judgment Act or by way of MLUDMA's judicial review provision, Appellants' underlying complaint is the same: they contend that Grantsville's annexation of the Property violated the Annexation Code. And for the reasons already explained, they lack statutory standing to complain about Grantsville's alleged noncompliance with those statutory requirements. Appellants are not permitted to use MLUDMA's procedural judicial review provision as an end run around their lack of statutory standing under the Annexation Code.[11]

¶42   But even assuming that we aren't correctly interpreting Appellants' MLUDMA claim and that the underlying grievance

---

11. In other words, *if* Appellants had statutory standing to protest Grantsville's annexation, and *if* they had exhausted their administrative remedies by doing so, *then* they may be able to invoke MLUDMA's judicial review provision to seek judicial examination of their complaint that Grantsville violated the Annexation Code by annexing the Property (assuming, of course, that they are an "adversely affected party" and that Grantsville's annexation was a "land use decision," *see supra* note 10).

for which Appellants seek judicial review concerns some unspecified violation for which they *would* have statutory standing to complain, they failed in that event to exhaust their administrative remedies. MLUDMA has a strict statutory exhaustion requirement, which mandates that "[n]o person may challenge in district court a land use decision until that person has exhausted the person's administrative remedies . . . ." *Id.* § 10-9a-801(1). Appellants do not contend that they complied with this requirement, and they acknowledge that they did not file any administrative challenge to the annexation of the Property. Instead, they assert that their failure to exhaust is excused by either of two of the established exceptions to the exhaustion requirement. In particular, Appellants assert that exhaustion would have been a futile exercise, and that exhaustion is excused here because Grantsville "acted outside the scope of its defined, statutory authority." *See Tooele County v. Erda Cmty. Ass'n*, 2022 UT App 123, ¶ 23, 521 P.3d 872 (stating that the recognized exceptions to the exhaustion requirement include situations "where exhaustion would serve no purpose, or is futile" and "where an administrative agency or officer has acted outside the scope of its defined, statutory authority" (quotation simplified)).

¶43 Appellants' futility argument is premised on the notion that filing a protest would have been futile because "they were aware that they did not have statutory standing to file a protest," and filing a protest without statutory standing is a futile exercise. We certainly can't argue with the logic of that statement. But it doesn't help Appellants here: as discussed above, Appellants' lack of statutory standing means they have no right to complain, to either administrative bodies or to the district court, about Grantsville's alleged violation of the Annexation Code. If Appellants lack statutory standing, then their claim fails regardless of any exhaustion requirement. The exhaustion requirement is only potentially relevant here if we indulge the assumption—which may be wrong—that Appellants' claim for judicial review might be based on something *other* than the

Annexation Code and for which they *might* have statutory standing. Yet Appellants make no argument that any such claim would be futile.

¶44 And we simply reject Appellants' contention that Grantsville, by annexing the Property, "acted outside the scope of its defined, statutory authority." *See id.* (quotation simplified). Inquiries about whether a municipality acted outside the scope of its authority are to be analyzed "at a categorical level, rather than a granular one." *Id.* ¶ 37. There is no doubt that Grantsville possesses statutory authority to annex land into its boundaries. The mere fact that "certain procedures may not have been followed, or requirements met," in exercising its statutory authority "does not mean that the action falls [outside] the agency's authority" for purposes of the exhaustion exception. *See Salt Lake City Mission v. Salt Lake City*, 2008 UT 31, ¶ 12 n.2, 184 P.3d 599; *see also Tooele County*, 2022 UT App 123, ¶ 36.

¶45 Thus, Appellants' MLUDMA claim fails because either Appellants lack statutory standing to bring it or they failed to exhaust their administrative remedies. In short, Appellants have no statutory standing to complain about any alleged violations of the Annexation Code that may have occurred during Grantsville's annexation of the Property. Appellants thus have no cognizable statutory claims, and the district court did not err by dismissing all their statutory claims on summary judgment.[12]

---

12. Appellants also challenge the district court's rulings—which it did not need to make, given its dismissal on standing grounds—that discussed the *merits* of their assertions that Grantsville violated the Annexation Code in annexing the Property, including the district court's ruling that our legislature, in enacting the Annexation Code, "created a statutory window"—after a feasibility study had been completed but before a final

(continued…)

### B. Constitutional Claims

¶46  But Appellants' claims also include grievances rooted not in statutes but in constitutional provisions. The district court dismissed these claims, along with the statutory claims, on the basis that Appellants could not "circumvent the plain language" of the Annexation Code "by relying on other unrelated" constitutional provisions. At some level, we sympathize with the district court, because Appellants' constitutional claims are not very clearly pleaded. But we ultimately agree with Appellants that the district court prematurely dismissed these claims without engaging in an analysis of whether Appellants have traditional standing to assert them.

¶47  As best we can ascertain (construing Appellants' claims liberally, as we must, *see Zubiate v. American Family Ins. Co.*, 2022 UT App 144, ¶¶ 11–16, 524 P.3d 148), Appellants take issue with the constitutionality of two aspects of the Annexation Code.[13]

incorporation petition was filed with the lieutenant governor's office—within which an annexation petition could lawfully be filed, notwithstanding the presence of ongoing incorporation efforts. But since we affirm the district court's dismissal of Appellants' statutory claims on standing grounds, we do not need to weigh in on the correctness of the court's merits-related rulings regarding those claims.

13. Indeed, during oral argument before this court, Appellants' counsel indicated that Appellants were challenging the constitutionality of certain provisions of the Annexation Code. Utah law requires a party making such a challenge to "notify the Attorney General of such fact by serving the notice on the Attorney General," Utah R. Civ. P. 24(d)(1), and, again during oral argument, Appellants' counsel asserted that she had notified the Attorney General of Appellants' challenge. We are unable to

(continued…)

First, they challenge the provision that limits the parties entitled to file a "protest to an annexation petition." *See* Utah Code § 10-2-407(1). Second, they challenge the provisions containing the so-called "statutory window," *see id.* § 10-2-403(5), which the district court interpreted as creating a window of time—after a feasibility study has been completed but before a final incorporation petition is filed with the lieutenant governor—during which annexation petitions can be filed regarding land within proposed city boundaries, even if incorporation efforts are ongoing.

¶48 These two aspects of the Annexation Code, according to Appellants, violate three distinct constitutional rights: (1) the right to due process, *see* U.S. Const. amend. XIV, § 1; *see also* Utah Const. art. I, § 7; (2) the open courts clause, *see* Utah Const. art. I, § 11; and (3) the right to put forth a citizen initiative, *see id.* art. VI, § 1.[14] Below, we provide a brief summary of Appellants' claims, as we understand them, related to each of these rights.

---

locate evidence of any such notice in the record submitted to us, but since Grantsville did not raise this issue on appeal, we leave this matter to be resolved, if necessary, on remand.

14. In their petition, Appellants made mention *only* of the due process right; their petition is entirely devoid of any mention of the open courts clause or the citizen initiative right. There is, therefore, some question in our minds as to whether Appellants properly pleaded constitutional challenges related to the open courts clause or the initiative right. But Grantsville raised no issue, either before the district court or on appeal, regarding the adequacy of Appellants' pleadings regarding these claims, and has chosen, in its brief, to challenge Appellants' standing arguments head-on. Thus, we follow Grantsville's lead and assume—without rendering any decision on the matter—that Appellants' constitutional claims are adequately pleaded, and we leave any questions in this regard to be resolved on remand.

¶49 Appellants' due process claim is apparently procedural, not substantive. And procedural due process "requires notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Migliore v. Livingston Fin., LLC*, 2015 UT 9, ¶ 27, 347 P.3d 394 (quotation simplified); *see also McBride v. Utah State Bar*, 2010 UT 60, ¶ 16, 242 P.3d 769 ("Procedural due process requires, at a minimum, timely and adequate notice and an opportunity to be heard in a meaningful way." (quotation simplified)). According to Appellants, they should have been afforded "a meaningful opportunity to be heard" before Grantsville annexed nearly 550 acres from within the proposed incorporation boundaries. And they claim that the Annexation Code, which does not allow them to file a protest of Grantsville's annexation of the Property and, instead, limits them to simply commenting at the annexation hearing along with other members of the public, does not provide them any meaningful opportunity to be heard.

¶50 Appellants also invoke the open courts clause of the Utah Constitution, Utah Const. art. I, § 11, which has been interpreted to provide some procedural protections but also, significantly, to "secure[] substantive rights, thereby restricting the legislature's ability to abrogate remedies provided by law." *Tindley v. Salt Lake City School Dist.*, 2005 UT 30, ¶ 13, 116 P.3d 295. Appellants argue that "[a]t common law," they "originally would have been entitled to a legal remedy" that would have allowed them to protest the annexation of the Property. In particular, Appellants claim that "[a]dversely affected land-owners" have long been afforded a common-law remedy "relating to annexations." Thus, Appellants contend that the Annexation Code, by not allowing them to protest Grantsville's annexation of the Property, effectively abrogated their alleged common-law right to challenge the annexation, and therefore violates the open courts clause of the Utah Constitution.

¶51 Finally, Appellants invoke the citizen initiative right found in the Utah Constitution, Utah Const. art. VI, § 1, which "vests in the voters of Utah the power to pass legislation through the initiative process." *League of Women Voters of Utah v. Utah State Legislature*, 2024 UT 21, ¶ 2. While our legislature "exercises its [legislative] power by passing laws during legislative sessions," the citizens of this state "exercise their [legislative] power by voting during elections on initiatives that have qualified for the ballot." *Id.*; *see also Gallivan v. Walker*, 2002 UT 89, ¶ 25, 54 P.3d 1069 ("Initiative is the power of a voter to directly legislate via exercising the right to vote."). Appellants assert that they were in the process of exercising their citizen initiative right by following the Incorporation Code and having the city of Erda officially incorporated. And, according to Appellants, this gave them "a cognizable interest distinct from the residents at large to protect their initiative[]," which as they see it meant "protecting the fixed boundaries that form the basis of their successful ballot measure." They believe that those efforts were undermined when Grantsville annexed the Property while Appellants were in the process of gathering the requisite signatures. In their view, the citizen initiative provisions of the Utah Constitution mandate that, "at the time [a] petition for incorporation is circulated for signature gathering, the boundaries must be definite and certain."

¶52 In its ruling on the competing motions for summary judgment, the district court concluded that Appellants lacked statutory standing to assert their claims and then went on to state that they could not "circumvent the plain language" of the Annexation Code "by relying on other unrelated" constitutional provisions. But, as noted above, *see supra* ¶ 33, our supreme court has rejected as "circular[]" the argument that a claimant who lacks statutory standing would be barred from challenging the relevant statute on constitutional grounds. *See Carlton v. Brown*, 2014 UT 6, ¶ 25, 323 P.3d 571; *see also Bleazard*, 2024 UT 17, ¶ 41 (rejecting the petitioners' claims for lack of statutory standing but noting that the petitioners had not alleged "that the [challenged action]

violated their constitutional rights"); *Summit County*, 2024 UT 16, ¶ 34 (same). Moreover, as already noted, *see supra* ¶ 33, the traditional standing test—and not the statutory standing test—is applicable where a party raises a challenge to the constitutionality of a state statute. Thus, to the extent that Appellants have raised claims challenging the constitutional validity of the Annexation Code, Appellants should be able to proceed with those claims if they can establish that they have traditional standing to do so.

¶53 The district court did not engage with the question of whether Appellants have traditional standing to bring these constitutional challenges. We must therefore remand the case to the district court to undertake that analysis, unless it is clear from the record that Appellants do not possess traditional standing. *See Olguin v. Anderton*, 2019 UT 73, ¶ 20, 456 P.3d 760 ("It is within our discretion to affirm a judgment on an alternative ground if it is apparent in the record." (quotation simplified)). Here, we do not think it is readily apparent from the record submitted to us that Appellants lack traditional standing.

¶54 Traditional standing requires an assessment of whether a plaintiff has alleged facts showing that the plaintiff satisfies each aspect of the traditional standing test—injury, causation, and redressability. *See Utah Chapter of the Sierra Club v. Utah Air Quality Board*, 2006 UT 74, ¶ 19, 148 P.3d 960. In our view, it is not apparent, in this record, that Appellants are unable to meet the first aspect of this test. Here, Appellants allege that they have been injured by Grantsville's annexation of the Property during their ongoing incorporation process. *See id.* (stating that "the petitioning party must *allege* that it has suffered or will suffer some distinct and palpable injury that gives it a personal stake in the outcome of the legal dispute" (emphasis added) (quotation simplified)). Appellants point out that the feasibility study was conducted based on the proposed municipal boundaries for the new city of Erda, and they argue that the removal of the Property from within its boundaries means they are "unable to rely upon

projections contained in Erda's feasibility study," something they allege "undermin[ed] confidence in . . . the continued viability of the fledgling city." According to Appellants, the study "hinged on the continuity of this area, and it took into account property tax revenue, and business tax revenue that identified the businesses that existed in the community." And "because [the Property] is essentially an island within Erda, Erda is responsible for the road maintenance and public safety surrounding [the Property]," which Appellants explain is a burden and financial cost that will have to be borne by the citizens of Erda "without the benefit of the revenue from development and additional property, sales, and business taxes." Appellants also identify potential environmental concerns that are contingent on whether Grantsville allows the Property to be used for commercial purposes. Based on those assertions, it is not clear, on this record, that Appellants—who are all residents of the new city of Erda and whose ranks include several sponsors of the Incorporation Petition—will not be able to show a particularized injury sufficient to satisfy the first prong of the traditional standing test.

¶55 As for causation and redressability, it is likewise not apparent from the record that Appellants are unable to meet these requirements. Because these issues are often "raised prior to the introduction of any evidence," courts are often left having to make a judgment as to the likelihood that the plaintiff will be able to establish both a causal relationship and that "the relief requested is substantially likely to redress the injury claimed." *Jenkins v. Swan*, 675 P.2d 1145, 1150 (Utah 1983). And while "a plaintiff claiming standing under the traditional criteria does not need to prove causation to the same extent it will be required to prove it at trial," *Utah Chapter of the Sierra Club*, 2006 UT 74, ¶ 32, there is nothing in the district court's ruling in this matter for us to review related to this prong of the traditional standing test. The same is true for redressability, and we are unable to conclude on this record that Appellants can, or cannot, satisfy this prong. For these reasons, we decline Grantsville's invitation to affirm the district

court's dismissal of Appellants' constitutional claims on the alternative—and heretofore unexamined—ground that Appellants lack traditional standing to bring those claims.

¶56 Finally, we address—and reject—Grantsville's contention that Appellants' failure to exhaust administrative remedies should also result in the dismissal of their constitutional claims (in addition to their statutory claims). Grantsville is correct when it asserts that litigants may not sidestep an exhaustion requirement simply by characterizing their claims as having some constitutional dimension. *See Patterson v. American Fork City*, 2003 UT 7, ¶ 18, 67 P.3d 466 (rejecting a party's categorical argument that exhaustion was never required for "state constitutional claims"); *see also Johnson v. Utah State Ret. Office*, 621 P.2d 1234, 1237 (Utah 1980) (stating that "the mere introduction of a constitutional issue" does not necessarily "obviate the need for exhaustion of administrative remedies"). The analysis is more complex than that, as we discuss. But ultimately we agree with Appellants that they did not need to exhaust administrative remedies before bringing *these* constitutional claims.

¶57 Grantsville correctly posits that, sometimes, litigants are required to exhaust administrative remedies even when their claims have some constitutional dimension. For instance, litigants must exhaust when their claim might be resolved at the administrative level in a way that would avoid the constitutional question altogether. *See Nebeker v. Utah State Tax Comm'n*, 2001 UT 74, ¶ 17, 34 P.3d 180 (holding that a litigant needed to exhaust administrative remedies when one of its claims was that the Tax Commission lacked constitutional authority to impose a specific interest rate, because "the Tax Commission could have determined that the imposition of the interest rate was unwarranted" and such a conclusion would have "avoided the constitutional questions"). And when the relevant administrative rules or processes incorporate constitutional concepts, litigants must exhaust administrative remedies for claims that implicate

those constitutional concepts. *See Demill v. Peace Officer Standards & Training Council*, 2023 UT App 56, ¶¶ 15–23, 531 P.3d 781.

¶58   But the situation is different when the gravamen of a litigant's claim is a request that a legislative enactment be struck down as unconstitutional, because only courts of law, which possess judicial power, have "the power to rule on the constitutionality of statutes." *See Renn v. Utah State Board of Pardons*, 904 P.2d 677, 681 (Utah 1995) (stating that the Utah Court of Appeals, and not just the Utah Supreme Court, "has the power to rule on the constitutionality of statutes" because this court "exercises Article VIII judicial power"). Administrative agencies and municipal boards do not possess judicial power and, accordingly, do not have the power to declare legislation unconstitutional. *See ABCO Enters. v. Utah State Tax Comm'n*, 2009 UT 36, ¶ 12, 211 P.3d 382 (stating, in a case involving a claim that the underlying taxation statute was unconstitutional, that "raising the state constitutional claim in the administrative proceeding would not have served any useful purpose related to notice because the [Tax] Commission had no authority to address any of the constitutional claims"); *Johnson*, 621 P.2d at 1237 (stating that "[a]dministrative agencies do not generally determine the constitutionality of their organic legislation"); *State Tax Comm'n v. Wright*, 596 P.2d 634, 636 (Utah 1979) ("It is not for the Tax Commission to determine questions of legality or constitutionality of legislative enactments." (quotation simplified)); *see also Muddy Boys, Inc. v. Department of Com.*, 2019 UT App 33, ¶ 18, 440 P.3d 741 ("[A]dministrative tribunals do not possess judicial power . . . ."). For these reasons, litigants whose claim is that statutory provisions should be declared unconstitutional need not—at least not where such claims cannot be avoided by a different resolution of the administrative process, *see Nebeker*, 2001 UT 74, ¶ 17—exhaust administrative remedies before bringing such claims to court. *See Smith Inv. Co. v. Sandy City*, 958 P.2d 245, 251 n.5 (Utah Ct. App. 1998) ("Regarding a facial—as opposed to an as-applied—attack [to a city ordinance],

the challenger need not seek a final decision regarding the application of the [ordinance] . . . before the government entity charged with its implementation." (quotation simplified)).

¶59 Appellants' constitutional claims, as we understand them, fit this bill: they are asking for certain provisions of the Annexation Code to be declared unconstitutional, and these claims could not have been avoided by a different resolution at the municipal level. Grantsville had no power to do anything other than apply the statutory provisions as written, and there is no realistic possibility that the outcome of any municipal protest would have resulted in avoidance of Appellants' constitutional grievances. Indeed, we agree with Appellants that any attempt to exhaust would have been futile here, where Grantsville was tasked with applying a statute that clearly gave Appellants no right to protest. In this situation, the correct place to bring a constitutional challenge to the Annexation Code was district court, not the Grantsville City Council.

¶60 For all of these reasons, we are unable to affirm the district court's dismissal of Appellants' constitutional claims on any of the alternative grounds suggested by Grantsville. We therefore conclude that the prudent course of action is to remand the matter to the district court so that it can apply the traditional standing analysis to these constitutional claims in the first instance.[15]

---

15. It should go without saying that our decision to remand this case to the district court for further consideration of Appellants' constitutional claims should not be taken as an indication of any opinion on our part, one way or the other, as to the *merits* of those claims. Simply put, the district court did not reach the merits of those claims—as opposed to the statutory claims—and neither do we. It is of course possible for litigants to have standing to raise claims that end up being deemed unmeritorious after full

(continued…)

CONCLUSION

¶61 The district court correctly dismissed Appellants' statutory claims—whether stated under the Annexation Code, the Declaratory Judgment Act, or MLUDMA—for lack of statutory standing. But Appellants' *constitutional* claims cannot be dismissed for lack of *statutory* standing, and the district court erred in dismissing those claims on that basis. Accordingly, we affirm the court's dismissal of Appellants' statutory claims but reverse its dismissal, at this procedural stage, of Appellants' constitutional claims, and we remand the case to the district court for further proceedings consistent with this opinion, including analysis of whether Appellants possess traditional standing to bring their constitutional claims.[16]

––––––––––

adjudication. *See Southern Utah Wilderness All. v. San Juan County Comm'n*, 2021 UT 6, ¶ 26, 484 P.3d 1160 ("As courts have consistently recognized, a plaintiff can have standing despite losing on the merits." (quotation simplified)). At various places in its briefing, Grantsville includes brief commentary and argument about the merits of Appellants' constitutional claims, but we decline Grantsville's invitation to address those arguments here, in the first instance, and we leave all such questions for consideration on remand as necessary.

16. In their briefing on appeal, Appellants also asserted that the district court had abused its discretion by "refusing," once it had concluded that Appellants lacked statutory standing, to convert the action into "one brought under [r]ule 65B" of the Utah Rules of Civil Procedure that seeks an extraordinary writ. Because we are reversing the dismissal of Appellants' constitutional claims, we need not reach this issue in this opinion. Appellants are, of course, free to pursue that request on remand, if necessary.